UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------

UNITED STATES

        - against -

SAMUEL REED,
                Defendant.

20-cr-500 (JGK)

MEMORANDUM OPINION
AND ORDER

---------------------------------------

JOHN G. KOELTL, District Judge:

    The defendant, Samuel Reed, has been charged in the Indictment, ECF No. 2, with violating and conspiring to violate the Bank Secrecy Act, 31 U.S.C. § 5311 et seq. (the "BSA"), in connection with his ownership and operation of a company called the Bitcoin Mercantile Exchange, or BitMEX. The Government argues that BitMEX was required to register as a futures commission merchant ("FCM") under the Commodity Exchange Act, 7 U.S.C. § 1 et seq. ("CEA"), and was therefore subject to the requirements of the BSA, in particular the requirement to implement and maintain an anti-money laundering program. The Indictment alleges that BitMEX did not comply with that requirement and that the defendant willfully caused and aided and abetted BitMEX in failing to do so.

    The defendant now moves to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3) on the grounds that he lacked fair notice that the conduct with which he is

charged was unlawful. See ECF No. 234. For the following reasons, the motion to dismiss the Indictment is **denied**.

I.

The following facts are taken from the Indictment and are accepted as true for the purposes of this motion to dismiss. See United States v. Velastegui, 199 F.3d 590, 592 n.2 (2d Cir. 1999).

In 2014, the defendant, along with Arthur Hayes and Benjamin Delo (the "co-founders"), founded BitMEX. Indictment ¶ 9. The defendant and his co-founders continued to own approximately 90% of BitMEX and its parent companies, to control those companies, and to be the senior executives of the companies. Id. ¶¶ 11-12.

The parent companies controlled by the defendant and his co-founders through which BitMEX was owned and operated were registered in the Seychelles. Id. ¶ 10. However, those parent companies had other subsidiaries "registered in the United States . . . that conduct[ed] BitMEX operations."[1] Id. The companies "never had a physical presence in the Seychelles," id., and indeed, certain BitMEX operations were conducted from Manhattan. Id. ¶ 19. "BitMEX has actively sought to, and has in fact, served thousands of customers located in the United

---

[1] Unless otherwise noted, this Opinion omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

2

States, even after purportedly withdrawing from the U.S. market in or about September 2015." Id. ¶ 2. Marketing activities directed to the United States included conferences in New York. Id. ¶ 29.

"BitMEX implemented an internet protocol ('IP') address check . . . purportedly designed to identify and block customers located in the United States from trading on BitMEX. But as the defendant[] well knew, and . . . intended," this check was applied "on just a single occasion for each customer," allowing customers to access the platform from the U.S. if they had shown a non-U.S. IP address only once. Id. ¶ 28. The defendant also caused BitMEX to allow customers to access the platform via means that the defendant knew allowed those customers to circumvent the IP check. Id. "[I]nternal BitMEX records reflect[] thousands of BitMEX accounts with United States location information that were enabled for trading." Id. ¶ 17. The Indictment alleges that Reed and others knew that specific customers residing in the United States continued to access BitMEX's platform into in or about 2018 and failed to take steps to deactivate the accounts of these United States customers. Id. ¶ 26.

Starting in November 2014, BitMEX "operated as an online trading platform" that "solicits and accepts orders for trades in . . . futures contracts and other derivative products tied to

3

the value of the cryptocurrencies including Bitcoin." Id. ¶ 1. BitMEX allows customers to leverage certain trades, and allows customers to margin those trades using Bitcoin. Id. ¶ 15. BitMEX also "operates an 'Insurance Fund' that it uses to guarantee the shortfall in the event that one counterparty to a trade goes into bankruptcy," which it pays for "by charging its customers a fee on the value of positions that remain open at the end of each eight-hour trading window." Id. ¶ 16.

BitMEX has never registered with the United States Commodity Futures Trading Commission ("CFTC"), although the Indictment charges that by its conduct BitMEX was an FCM and thereby required to register as an FCM with the CFTC. Id. ¶¶ 6, 18. Because it was required to register as an FCM, the Indictment charges, BitMEX was required to establish an anti-money laundering ("AML") program, including an adequate customer identification program, commonly known as a know your customer ("KYC") program. Id. ¶ 8. The Indictment charges that the defendant and others willfully failed to establish, implement, and maintain an adequate AML program, including a KYC program, in violation of the BSA. Id. ¶ 4.

The Indictment alleges that the defendant knew that BitMEX served U.S. customers, knew that BitMEX was required to have compliant AML procedures if it served U.S. customers, and knew that BitMEX lacked such procedures. Id. ¶ 25. The Indictment

4

alleges that the defendant willfully caused BitMEX to fail to adopt such procedures, or aided and abetted that failure. Id.

## II.

The Government argues that the motion to dismiss should be denied because it is untimely. However, the Court has permitted the argument to be made at this time. ECF No. 239. Accordingly, the Court will proceed to the merits of the motion to dismiss.

## III.

An indictment is sufficient if it contains the elements of the offense charged and fairly informs a defendant of the charge against him. See United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998). Due process requires that a criminal statute provide a person of ordinary intelligence fair notice of what is prohibited. United States v. Williams, 553 U.S. 285, 304 (2008). "Due process is not, however, violated simply because the issue is a matter of first impression." Ponnapula v. Spitzer, 297 F.3d 172, 183 (2d Cir. 2002). "[I]t is immaterial that there is no litigated fact pattern precisely in point," so long as the language of the statute provides notice. United States v. Kinzler, 55 F.3d 70, 74 (2d Cir. 1995). Moreover, "a scienter requirement may mitigate" notice concerns. Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 499 (1982).

5

In this case, the statutory definition of an FCM under the CEA as well as the requirements of the BSA are clear and the Indictment alleges that the defendant knowingly and willfully caused and aided and abetted BitMEX's failure to comply with the BSA. That is a sufficient basis to deny the motion to dismiss the Indictment.

The defendant argues that he lacked fair notice that the charged conduct was illegal because he lacked notice that a platform with BitMEX's features could be an FCM, and that cryptocurrencies are commodities within the meaning of the CEA. Neither of these arguments has merit.

**A.**

The BSA includes in the definition of "financial institution" a "futures commission merchant . . . registered, or required to register, under the Commodity Exchange Act." 31 U.S.C. § 5312(c). The CEA defines an FCM as an "individual, association, partnership, corporation, or trust that is engaged in soliciting or in accepting orders for the purchase or sale of a commodity for future delivery; a security futures product; [or] a swap . . . and in or in connection with [such] activities . . . accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom." 7 U.S.C. § 1a(28). The CEA requires persons meeting this

6

definition to register as futures commission merchants. Id. § 6d(a)(1).

The BSA goes on to provide that financial institutions must "establish anti-money laundering . . . programs" and that the Secretary of the Treasury "may prescribe minimum standards for [such] programs." 31 U.S.C. § 5318(h). The BSA also empowers the Secretary of the Treasury to "prescribe regulations setting forth the minimum standards for financial institutions . . . regarding the identity of the[ir] customer[s]." Id. § 5318(ℓ).

The Indictment alleges that BitMEX literally fell within the statutory definition of an FCM. BitMEX solicits and accepts orders for trades in, among other things, futures contracts and other derivative products tied to the value of cryptocurrencies including Bitcoin. BitMEX accepts Bitcoin to margin and guarantee its derivative products, and has offered leverage to its customers on certain products. Indictment ¶ 1. BitMEX's conduct thus fell within the plain language of the statute, giving the defendant notice that BitMEX was an FCM. See, e.g., Kinzler, 55 F.3d at 74; United States v. Block, No. 16-cr-595, 2017 WL 1608905, at *3 (S.D.N.Y. Apr. 28, 2017).

The defendant argues that he nonetheless lacked notice because BitMEX had features that could have made the company fall within other registration categories under the CEA, and no entity had previously been required to register under more than

7

one category. However, even if BitMEX might have also fallen within another registration category, the registration categories are not exclusive of one another. The defendant does not explain why BitMEX did not fall literally within the definition of an FCM. The fact that other entities may have registered in other categories does not preclude the fact that BitMEX is an FCM. Moreover, there appears to be no dispute that BitMEX did not register with the CFTC under any category.

The defendant also argues that the definition of an FCM should be read to require that an FCM be an "intermediary between customers and an exchange," Mem. in Supp. of Mot. to Dismiss, ECF No. 235, at 1, whereas BitMEX is a direct exchange. But the defendant points to no limitation in the definition of an FCM that requires that an FCM be an intermediary.

Finally, the defendant cites to a 2021 statement by a CFTC commissioner. Dawn D. Stump, Concurring Statement of Commissioner Dawn D. Stump Regarding Enforcement Action Against Payward Ventures, Inc. (d/b/a Kraken), CFTC (Sept. 28, 2021), https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement0 92821b. That statement called for CFTC guidance in situations where an entity was both an FCM and a Designated Contract Market.

Commissioner Stump's statement does not help the defendant. First, the statement was made in September 2021, and could not

8

have created any doubt in the defendant's mind for almost all of the conduct charged in the Indictment. In any event, in her statement, Commissioner Stump noted that the entity at issue in that case met the definition of an FCM and that the entity operated as an FCM without registering and thereby violated the CEA.

**B.**

The defendant also argues that he did not have notice that Bitcoin is a commodity under the CEA. However, the defendant had ample notice from the broad definition of commodities under the CEA that cryptocurrencies were within the definition of commodities. The CEA defines commodities as:

> [W]heat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, <u>and all other goods and articles</u>, except onions (as provided by section 13-1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), <u>and all services, rights, and interests</u> (except motion picture box office receipts, or any index, measure, value or data related to such receipts) <u>in which contracts for future delivery are presently or in the future dealt in</u>.

7 U.S.C. § 1a(9) (emphases added). "[C]ontracts for future delivery" in cryptocurrencies are "dealt in." Thus, under the plain language of the CEA, cryptocurrencies fall within the definition of commodities. See CFTC v. My Big Coin Pay, Inc.,

9

334 F. Supp. 3d 492, 496-98 (D. Mass. 2018). This plain language is buttressed by a core characteristic that cryptocurrencies share with other commodities whose derivatives are regulated by the CFTC — namely, that they are "exchanged in a market for a uniform quality and value." CFTC v. McDonnell, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018), adhered to on denial of reconsideration, 321 F. Supp. 3d 366 (E.D.N.Y. 2018); see also United States v. Smith, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014) (noting that due process "requires only that the statutory language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices"), aff'd sub nom. United States v. Halloran, 664 F. App'x 23 (2d Cir. 2016). The defendant thus had notice that cryptocurrencies were commodities.

Several courts, construing the CEA, have arrived at the same conclusion. See, e.g., My Big Coin Pay, 334 F. Supp. 3d at 498; McDonnell, 287 F. Supp. 3d at 228-29. The defendant argues that these decisions did not provide fair notice that cryptocurrencies were commodities because the decisions postdated some of BitMEX's activities and were non-precedential. But in light of the clear language of the relevant statutes, additional clarity from interpretive decisions is not required. See, e.g., Kinzler, 55 F.3d at 74; Block, 2017 WL 1608905, at *3. In any event, even non-precedential decisions can add a

10

"judicial gloss" to the construction of a statute that provides the requisite notice. See, e.g., United States v. Riccio, 43 F. Supp. 3d 301, 307 (S.D.N.Y. 2014).

Finally, the defendant argues that it is unclear that cryptocurrencies are commodities because they are also sometimes categorized as "funds" or "investment contracts." However, the fact that cryptocurrencies may be regulated under additional statutes such as as a "fund" under the Anti-Drug Abuse Act of 1986, see 18 U.S.C. § 1956, or as an "investment contract" under the Securities Act of 1933, see 15 U.S.C. § 77b, does not mean that a cryptocurrency is not a "commodity" within the meaning of the CEA, an entirely distinct statute that was enacted in 1922. See Pub. L. No. 74-675, 42 Stat. 998. Indeed, several agencies may have concurrent regulatory authority in the cryptocurrency space. See, e.g., McDonnell, 287 F. Supp. 3d at 222, 228-29 ("The jurisdictional authority of CFTC to regulate virtual currencies as commodities does not preclude other agencies from exercising their regulatory power when virtual currencies function differently than derivative commodities." Id. at 228.); Dawn D. Stump, Digital Assets: Clarifying CFTC Regulatory Authority and the Fallacy of the Question, "Is It a Commodity or a Security?", CFTC 2 (Aug. 23, 2021), https://www.cftc.gov/media/6306/DigitalAssetsAuthorityIn fographic_CommStump082321/download.

11

Accordingly, the defendant had adequate notice that cryptocurrencies were commodities within the meaning of the CEA.

The defendant relies extensively on the Supreme Court's opinion in United States v. Pennsylvania Industrial Chemical Corp., 411 U.S. 655 (1973). In that case, the defendant was convicted after trial of violating the Rivers and Harbors Act of 1899 by discharging industrial pollutants into a navigable river. The Supreme Court held that the conviction should be reversed because the trial court excluded evidence that the Army Corps of Engineers consistently limited its regulations to obstructions to navigation and thus may have deprived the defendant of fair warning as to what conduct the Government intended to criminalize. Id. at 673-74. The Court found that it was error to exclude evidence that the defendant was "affirmatively misled into believing that the discharges in question were not a violation of the statute." Id. at 675. The excluded evidence related to whether there was "reliance" and "whether that reliance was reasonable under the circumstances." Id.

Pennsylvania Industrial Chemical does not help the defendant. It did not support dismissal of the indictment, but rather affirmed the possibility of a defense based on reliance on allegedly consistently misleading agency regulations. In this case, the defendant can, of course, present any evidence to

respond to the Government's argument that he knowingly and willfully violated the BSA. But in the current motion, the defendant has failed to show that consistent agency regulations showed that BitMEX was not an FCM, or that Bitcoin was not a commodity, under the CEA. In any event, the time to present evidence of his reliance on any such regulations is at trial.

## Conclusion

The Court has considered all of the arguments of the parties. To the extent not addressed herein, the arguments are either moot or without merit. For the foregoing reasons, the motion to dismiss the Indictment is **denied**. The Clerk is directed to close ECF No. 234.

SO ORDERED.
Dated:   New York, New York
         February 28, 2022

                                    _____
                                    John G. Koeltl
                                    United States District Judge