**Douglas K. Yatter**
Direct Dial: (212) 906-1211
douglas.yatter@lw.com

1271 Avenue of the Americas
New York, New York  10020-1401
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

# LATHAM&WATKINS LLP

| | |
|---|---|
| FIRM / AFFILIATE OFFICES | |
| Austin | Moscow |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Shanghai |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

June 29, 2022

## <u>VIA ELECTRONIC MAIL</u>
**(redacted version filed via ECF)**

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York  10007

Re:     *United States v. Hayes, et al.*, 20 Cr. 500 (JGK)

Dear Judge Koeltl:

On behalf of our client, Samuel Reed, we respectfully submit this letter in connection with Mr. Reed's sentencing, which is scheduled for July 13, 2022.  For the reasons that follow, we request that the Court sentence Mr. Reed to time served.  We note that Mr. Reed has fully satisfied the stipulated fine set forth in his plea agreement by paying a $10 million civil monetary penalty to the Commodity Futures Trading Commission ("CFTC").  No other sanctions are necessary for Mr. Reed.

## I.    CASE BACKGROUND

### A.    The Indictment and Guilty Plea

On September 21, 2020, a grand jury returned a sealed indictment against Arthur Hayes, Benjamin Delo, Mr. Reed, and Greg Dwyer, alleging that they willfully caused BitMEX to fail to have an anti-money laundering ("AML") program required under the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 *et seq.* (Count One), and conspired to do the same, 18 U.S.C. §§ 2, 371 (Count Two).  Indictment ¶¶ 30, 32.  The Indictment alleged that Mr. Reed and his co-defendants founded BitMEX—an "online trading platform" and "derivatives exchange"—in or about January 2014 and registered the entities that own and operate BitMEX in the Seychelles. *Id.* ¶¶ 1, 9-10, 18.  Both counts of the Indictment relied on the legal theory that BitMEX was required to register with the CFTC as a futures commission merchant ("FCM") under the Commodity Exchange Act ("CEA").  *Id.* ¶¶ 3, 5-8, 18.

The Indictment asserted that, by September 2015, Mr. Reed and his co-defendants understood that BitMEX was required to implement BSA-compliant AML and know your customer ("KYC") procedures if BitMEX served U.S. customers.  *Id.* ¶¶ 21, 25.  The Indictment noted that BitMEX announced its exit from the U.S. market following two CFTC enforcement

LATHAM&WATKINS LLP

orders against other businesses in September 2015 which addressed the CFTC's jurisdiction over cryptocurrencies, *id.* ¶¶ 2, 28, but the Indictment alleged that the defendants thereafter "encouraged or allowed BitMEX to be accessed and used by U.S. customers" and "failed to take steps to effectively restrict U.S. customers from accessing BitMEX." *Id.* ¶¶ 22, 25.

On the morning of October 1, 2020, the government arrested Mr. Reed without notice at his home in Massachusetts. The three other defendants were all outside the U.S. at the time, and Mr. Delo and Mr. Hayes arranged voluntary appearances several months later (in March and April, respectively).

On February 24, 2022, Mr. Hayes and Mr. Delo each pleaded guilty pursuant to a written plea agreement to Count One of the Indictment—namely, willfully causing BitMEX to violate the BSA—and each agreed to pay a fine of $10 million, subject to a reduction for any civil penalty paid to the CFTC before sentencing. Hayes Plea Hr'g Tr. at 14:20-17:9 (Feb. 24, 2022); Delo Plea Hr'g Tr. at 14:18-17:6 (Feb. 24, 2022). On March 9, 2022, Mr. Reed did the same. Reed Plea Hr'g. Tr. at 18:21-25:4 (Mar. 9, 2022); Ex. A.[1]

In his plea agreement, unlike the ones for Mr. Hayes and Mr. Delo, the government stipulated that no enhancements under the U.S. Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") applied to Mr. Reed, resulting in a lower Zone A Guidelines range of 0-6 months. The Stipulated Guideline Calculation for Mr. Reed is as follows:

> Pursuant to U.S.S.G. § 2S1.3(a)(1), the base offense level is **8**.

> Pursuant to U.S.S.G. §3E1.1(a), for acceptance of responsibility, the offense level is **decreased by 2**.

> Accordingly, the Total Offense Level is **6**.

Ex. A. Mr. Reed has no criminal history. *Id.*; PSR ¶ 5.

At his guilty plea, Mr. Reed accepted responsibility and stated that he co-founded BitMEX, an online trading platform which offered derivatives based on cryptocurrencies such as Bitcoin, and that the platform accepted Bitcoin as margin for users' positions. Reed Plea Hr'g. Tr. at 25:16-19 (Mar. 9, 2022). Mr. Reed "understood that some U.S. users still accessed the platform" despite BitMEX's policy banning U.S. users, and that if BitMEX had U.S. users trading on the platform, "there would be a requirement under U.S. law for BitMEX to have a [KYC] program." *Id.* at 25:20-25. Mr. Reed admitted that before September 2020, BitMEX did not have a comprehensive KYC or AML program and did not file suspicious activity reports ("SARs") with U.S. regulators, and that the steps taken by BitMEX to limit access by U.S. users "were insufficient in the absence of comprehensive KYC." *Id.* at 26:1-7. Mr. Reed

---

[1] "Ex. __" refers to exhibits attached to this sentencing submission, including letters of support, and "PSR" refers to the Final Presentence Investigation Report for Mr. Reed dated May 31, 2022. For reasons of personal privacy and security, we have redacted certain personal information from this sentencing submission and accompanying exhibits.

LATHAM&WATKINS LLP

acknowledged that "despite knowing about the presence of U.S. users," he "continued to participate in BitMEX's operations" and, "as chief technology officer of the company, . . . failed to implement" a BSA-compliant anti-money laundering program. *Id.* at 26:8-10, 27:18-20. The Court then accepted Mr. Reed's guilty plea. *Id.* at 30:20-22.

### B.    Settlement of Parallel Regulatory Proceedings

On the day the Indictment was unsealed, the CFTC sued several BitMEX entities and its founders, including Mr. Reed. *See* Compl., *CFTC v. HDR Global Trading Ltd., et al.*, No. 1:20-cv-08132 (S.D.N.Y. Oct. 1, 2020). On August 10, 2021, the BitMEX entities settled with the CFTC and also reached an agreement with the Financial Crimes Enforcement Network ("FinCEN"). Pursuant to those agreements, the BitMEX entities agreed to pay a $100 million civil monetary penalty, with $50 million being paid to the CFTC and the remaining $50 million offset by payments and credits with FinCEN. *See* ECF No. 62; *FinCEN Announces $100 Million Enforcement Action Against Unregistered Futures Commission Merchant BitMEX for Willful Violations of the Bank Secrecy Act*, FINCEN (Aug. 10, 2021), available at https://www.fincen.gov/news/news-releases/fincen-announces-100-million-enforcement-action-against-unregistered-futures.

Subsequently, each founder also reached a civil settlement with the CFTC, and on May 5, 2022, Chief Judge Swain approved these settlements. *See* ECF Nos. 89-91. As part of his settlement, Mr. Reed has paid a $10 million civil monetary penalty to the CFTC. Ex. B. Under Mr. Reed's plea agreement, as noted, the $10 million civil monetary penalty paid to the CFTC satisfies the stipulated $10 million fine in this case. Ex. A at 2.

## II.    PERSONAL BACKGROUND

### A.    Mr. Reed's Childhood and Education

Mr. Reed was born in Tucson, Arizona, the youngest of three boys, to his parents Trace Reed and Lauren Hofland (nee Rose). PSR ¶¶ 82-83. His father worked as a network administrator as a civilian for the U.S. Air Force. *Id.* ¶ 82. After 18 months in Tucson, Mr. Reed and his family moved to San Antonio, Texas for two years, before moving to Manitowoc, Wisconsin, where he lived until leaving for college at age 17. *Id.* ¶ 84.

Mr. Reed's parents divorced when he was four years old. *Id.* Thereafter, he spent approximately two-thirds of his time with his mother and one-third with his father. *Id.* Mr. Reed was and continues to be very close to his mother, father, and two brothers. Ex. C at 1; PSR ¶¶ 82-83, 88, 90-91.

Mr. Reed's mother remarried to Darrell Hofland 15 years after her divorce from Mr. Reed's father, and Mr. Reed grew up primarily "in a single parent household." PSR ¶¶ 86, 90. Mr. Reed's mother "has held many jobs including as an editor of a newspaper, [in] freelance marketing, [for] United Way, [as] an assistant county executive and other non-profit and grant-writing positions." *Id.* ¶ 82. Mr. Reed had a comfortable but unadorned home environment. As Mr. Reed's mother writes, she "was not able to buy [her] children some of the expensive toys

LATHAM&WATKINS LLP

their friends had." Ex. D at 1. After his mother explained the family's financial situation to a young, but thoughtful and industrious Mr. Reed, he took it upon himself to start working from a young age. *Id.*

As Mr. Reed's grandmother, Beverly Rose, notes in her letter, Mr. Reed "was born with many exceptional gifts into a fairly ordinary family," and "[h]e learned early . . . [how] to program computers." Ex. C at 1. At just "age 13, he started fixing computers and setting up networks for individuals and businesses." Ex. D at 1. By "15, he went to Birmingham, England, to set up a computer network for Manitowoc-based Baileigh Industrial," where he worked throughout high school. *Id.*; PSR ¶ 109. His early "self-relian[ce]" and "problem-solv[ing]" paid off, and "[a] few years later, [Mr. Reed] bought his own car" with earnings he had saved. Ex. D at 1. To this day, Mr. Reed is grateful to his mother for the extraordinary lesson she taught him about the value of hard work. *Id.*

Mr. Reed's high school teacher, Mary Ann Teshima, recalls that Mr. Reed "always . . . took school more seriously [than others] and was driven to excel academically and otherwise." Ex. E at 1. She observes that Sam was a "delightful student who always completed assignments above expectation, and engaged in class discussions thoughtfully, meaningfully, and respectfully." *Id.* In high school, Mr. Reed also "pursued musicals and dramas" and "went to Turkey and Vienna with the choir." Ex. C at 1. Ms. Teshima fondly "remember[s] him playing the character Javert in Les Miserables." Ex. E at 1. She describes Mr. Reed as "a kind, loving, compassionate person, and [she] ha[s] tremendous memories of him" from his high school years. *Id.*

Mr. Reed's mother explains that Mr. Reed "was always a child and a man of his word" who "followed the rules, and he never got into trouble." Ex. D at 1. His grandmother similarly writes of Mr. Reed's "strong moral characteristics," also observing that he "always followed the rules." Ex. C at 1-2; PSR ¶¶ 76-77. She adds that "[i]t was typical for Sam to do more, because he realized he got more," and his hard work and diligence in high school paid off. Not only "was [Mr. Reed] named a member of the National Honor Society" before graduating in 2006, but he also "sought and gained a scholarship at Washington and Lee University." Ex. C at 1; PSR ¶¶ 99-100. As his grandmother observes, "[w]hile his brothers went to the Wisconsin state universities for their college educations," going to Washington and Lee "garnered [Mr. Reed] many opportunities a state university diploma did not," and "of [the] three boys [he is] the most accomplished." Ex. C at 1.

Just as he had done his entire life, Mr. Reed used his "extraordinary curiosity and intelligence" to excel at Washington and Lee. *Id.* He pursued his "love of technology" and focused his studies on computer science, making Dean's List in several semesters. Ex. F at 1; PSR ¶ 100. In 2010, Mr. Reed graduated *cum laude* with a Bachelor of Science in Computer Science. PSR ¶ 100. He also graduated with a German Minor and can read, write, and understand the German language. *See id.* ¶ 101. As in high school, Mr. Reed accomplished his academic feats while working to help support himself on the side. Throughout college he worked at the college IT help desk and "earned extra money for books, school trips, and recreation by refurbishing LCD televisions." Ex. D at 1.



While at Washington and Lee, ███████████████████████████████ ████████████████████████████ Even though he is still just 33 years old, ███████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████

## B.    Mr. Reed's Early Professional Background Before BitMEX

Mr. Reed's "love of technology and computer programming" led him to continue in the field after graduating from Washington and Lee in May 2010.  Ex. J at 1; *see* PSR ¶ 109.  Before BitMEX, Mr. Reed never worked in any financial services business of any kind and never held any regulatory or compliance role.  He is a computer coder who focused on web design, architecture, and user experience.

Mr. Reed's first job after graduation was as a Junior Web Application Developer for a U.S. Army defense contractor, SmartNet, at Fort Belvoir in Virginia, a position he held from July 2010 to December 2010 and for which he obtained a "Secret" security clearance.  PSR ¶ 108.  He then decided to try to make a go of it in the startup world.  From 2011 to 2013, he did computer programming for several companies in Washington, D.C., including as a Software Engineer at Linked Senior, Inc., "a company [that] creat[ed] edtainment software for seniors in assisted living facilities," and as Chief Technology Officer and Director of Software Engineering at Tixelated, an event planning platform.  Ex. H at 1; PSR ¶ 109.

In 2013, at the age of 24, Mr. Reed moved to Hong Kong to work for a client, partly driven by his and Agata's passion for travel.  Ex. G at 1; *see also* PSR ¶¶ 87, 109.  From 2013 to 2014, Mr. Reed worked as Chief Technology Officer and Principal Web Application Developer for Global Brand Solutions Limited and Brand Enforcement Services Limited (Identify.com) in Hong Kong.  PSR ¶ 109.  These companies performed large-scale web-crawling and made use of new machine-learning techniques to perform trademark and brand protection, allowing companies quickly and easily to detect and take down counterfeits and scams.  As his wife Agata remembers about these early professional endeavors, Mr. Reed "always impressed [her] with his work ethic" and "wasn't afraid of taking on new opportunities."  Ex. G at 1.

## C.    Mr. Reed's Role in BitMEX

### 1.    Founding and Launch of the Platform

In late 2013, at the age of 25 and newly living in Hong Kong, Mr. Reed met Arthur Hayes at a programming conference, where Mr. Reed presented on career opportunities in web development to a group of digital boot-camp graduates, some of whom he taught or mentored.  At the time, Mr. Hayes was an experienced derivatives trader and early devotee of the nascent cryptocurrency industry.  Mr. Hayes saw the potential to build a startup in the industry and had the idea to create a new cryptocurrency derivatives trading platform that became BitMEX.  Though Mr. Reed was familiar with cryptocurrency, he had no experience in finance or trading,

LATHAM & WATKINS LLP

let alone regulations or compliance related to those industries.  In fact, when Mr. Hayes described the idea for BitMEX, Mr. Reed did not even know what a derivative was.[2]

Mr. Hayes came up with the idea for BitMEX, but did not have the coding skills to design and build an online website and trading platform.  Mr. Reed's education and professional experiences—including implementation of modern, real-time web applications and interfaces—were just what Mr. Hayes was looking for in a technology-focused partner to create the platform's front-end website and application programming interface.  Mr. Reed warned Mr. Hayes, however, that he did not have the financial and mathematical knowledge necessary to create the markets themselves.

To fill this gap, Mr. Hayes also brought in Mr. Delo, an Oxford-educated software developer with experience building financial technology systems.  At the time, Mr. Delo was working as a computer programmer in J.P. Morgan's Hong Kong office.  Mr. Delo assumed responsibility for building BitMEX's financial products and trading engine.

Mr. Hayes, as CEO, was the business leader and public face of BitMEX.  PSR ¶¶ 19, 36. He was responsible for management of the business, including corporate organization and strategy, compliance, marketing, and investor relations.  *See id.* ¶ 19.  Mr. Hayes also focused on product and business development, which included promoting the business and seeking investment capital.  *Id.*

At its inception in Hong Kong, BitMEX was a startup in the truest sense of the word: it was composed solely of the founders—all in their twenties—and had no employees or external funding.  The founders worked on card table desks and partially funded the startup with their own modest funds and personal credit cards.  The three also worked unpaid.  To make ends meet, Mr. Reed continued to spend substantial time freelancing in programming roles for two other businesses, dividing his time and attention so that he could pay his and BitMEX's bills.  *Id.* ¶ 104.

With no outside assistance, the three men had the bold and complicated goal of designing, building, developing, and launching one of the world's first Bitcoin derivatives trading platforms.  At that time, the cryptocurrency trading world was in its infancy and had not received the extensive regulatory attention of the past few years, either in the U.S. or elsewhere, and cryptocurrency derivatives were nearly unheard of.  Against this backdrop, the founders sought to launch an online platform to fill a gap in the market as an innovative, trusted, and reliable platform for cryptocurrency derivatives trading.  Despite their limited resources, the founders built and launched the BitMEX platform in November 2014.  Its trading volume was low at first and there was little revenue and no profits.  Although the founders devoted long hours to the business, it did not perform well for the first year and continued to operate on a meager budget throughout 2015 and much of 2016.

---

[2] *See* Damian Reilly, *Breaking the bank – Who's afraid of bitcoin?  BitMEX co-founder Sam Reed tells Damian Reilly what it took to create the world's largest bitcoin exchange*, THE SPECTATOR (Nov. 10, 2018), available at https://www.spectator.co.uk/article/breaking-the-bank-who-s-afraid-of-bitcoin-.

LATHAM&WATKINS LLP

Mr. Reed spent only a short time in Hong Kong with his two co-founders. PSR ¶¶ 56-57. Although the co-founders met and first began work on the business in Hong Kong, Mr. Reed left Asia before BitMEX's website launched publicly. He married Agata in August 2014 and did the bulk of his early work on BitMEX's website in 2014 and 2015 while traveling with his new wife. PSR ¶¶ 88-89; *see also* Ex. G at 2. In 2015, the couple moved near Mr. Reed's hometown in Wisconsin to be close to his family. PSR ¶ 89; Ex. G at 2. After that, he spent only two to three weeks per year in Asia and was removed from day-to-day interactions and many of the operational and management decisions made by Mr. Hayes and Mr. Delo in Hong Kong, including corporate strategy, operations, and hiring decisions.

2.    Mr. Reed's Role as BitMEX Grew

It was not until 2017 and 2018 that BitMEX began to experience rapid growth, following the Company's decision to focus on the Asia markets and retail customers, with the Chinese market in particular being recognized as a key growth engine for Bitcoin. The Company's growth also occurred during a widespread rise of interest and activity in the cryptocurrency market, especially in Asia.

Since inception, the founders thoughtfully designed BitMEX with features that increased the platform's security, including its use of multi-signature cold wallets and limited withdrawals. Among its various novel features, BitMEX used only wallets beginning with the prefix "3BMEX" to stamp transactions with the platform. The 3BMEX prefix labeled every deposit to, and withdrawal from, BitMEX with a permanent identifier, ensuring that any such transactions would be identifiable with BitMEX forever on the public blockchain. These features were completely unique in the cryptocurrency industry and helped build BitMEX's reputation as an innovative, secure, and reliable platform.

Before helping to launch BitMEX, Mr. Reed had never worked in the financial industry at all. Mr. Hayes as CEO led the Company's effort to keep abreast of regulatory developments in the cryptocurrency industry. Mr. Reed, for his part, had no experience from which to evaluate such matters, but nonetheless helped the Company take proactive steps to comply with rules as they emerged. BitMEX implemented several controls and improved them over time. For example:

- In August 2015, after New York State announced the rollout of its Bitlicense in June, the Company updated its Terms of Service to prohibit users from New York state or any other jurisdiction where the services offered by BitMEX were restricted.

- In September 2015, when the CFTC announced the filing and settlement of two enforcement actions that conveyed the agency's position for the first time that Bitcoin is a commodity and that futures and swaps based on Bitcoin fall under the CEA, the Company amended its Terms of Service and implemented measures to prohibit U.S. persons from trading on the BitMEX platform. At that time, the Company began (i) requiring users to declare their country of residence at account creation, (ii) verifying users' locations via GeoIP at registration, and (3) ensuring that users detected with IP

LATHAM&WATKINS LLP

addresses from the U.S. would not be shown a Bitcoin deposit address or be able to trade.

As BitMEX's business and resources grew, the Company drew on more sophisticated legal counsel and hired experienced professionals to provide broader support and expertise and to fill key management functions. With support from in-house and outside counsel and professionals, the Company took additional steps to prevent persons from restricted jurisdictions, including the U.S., from trading:

- Beginning in June 2018, BitMEX expanded its GeoIP capability by refining the precision with which a user's location could be recognized.

- Beginning in summer 2018, the Company implemented KYC procedures through Jumio, a third-party vendor, to collect and verify government-issued ID from users in certain circumstances, such as when a user lost a two-factor authentication device.

- In October 2018, the Company began querying and storing the locations of existing and prospective users based on IP address at every login of the BitMEX website, instead of just at registration.

These measures were not sufficient to prevent BitMEX from having U.S. customers, and Mr. Reed acknowledged that at his guilty plea. *See* Reed Plea Hr'g. Tr. at 26:1-7 (Mar. 9, 2022). But his responsibility for the Company's failure to have a BSA-compliant KYC and AML program should be viewed differently from his co-founders, given his role and responsibilities as reflected in the lower Guidelines range in his plea agreement.

Living in Wisconsin far away from the Company's Hong Kong headquarters, Mr. Reed was not focused on regulatory compliance matters, but instead on the computer programming and technical maintenance under his purview. PSR ¶ 57. While he sometimes helped cover customer support inquiries and fielded occasional technical questions or discussions, his role was generally not customer-facing. Indeed, his work building and maintaining the platform's technological architecture was a round-the-clock role. As the company's user base grew and as the Company introduced new and complex products and services on the platform, the technological demands on Mr. Reed to scale the front-end technology in a secure manner grew exponentially. He had to ensure BitMEX's website was secure and stable at all times, day and night, for BitMEX's global users.

During this same time period, Mr. Reed also continued to devote himself to numerous public, open-source coding projects. In fact, in 2016-17 he was recognized as one of the top 25 most active open-source programmers in the world.[3] With his heavy, around-the-clock workload, Mr. Reed had no time (much less relevant knowledge or experience) to look over the shoulders of those handling the Company's legal and compliance functions. He "trusted his

---

[3] *See Most Active GitHub Users*, GitHub Gist, available at https://gist.github.com/paulmillr/2657075.

**LATHAM&WATKINS** LLP

partners" and the experienced managers, executives, and counsel hired by BitMEX "implicitly with [other] critical piece[s] of the business." Ex. D at 1.

By 2018, Mr. Reed had run himself ragged at the Company and was burned out from the endless hours. He went on a six month sabbatical from September 2018 to February 2019, as the Company had finally hired additional resources for website engineering and front-end technological support. PSR ¶ 14. During his sabbatical, Mr. Reed had no involvement in day-to-day BitMEX matters. *Id.* When he returned, Mr. Reed became a non-executive director in a less engaged role than his co-founders had at that time. *Id.*

In May 2019, shortly after Mr. Reed's return from sabbatical, the founders decided to change the Company's policies to adopt a comprehensive KYC requirement. Mr. Reed fully supported this decision and was involved in the extensive planning and preparation for its technical implementation. The Company informed the CFTC of its commitment to implement comprehensive KYC in January 2020 and announced the KYC program publicly in August 2020, months before the indictment in this case. Thereafter, the Company accelerated its rollout and by December 2020 had implemented comprehensive KYC for its entire user base. Notably, BitMEX was among the first cryptocurrency trading platforms to implement full KYC for its entire user base, and even at the time of this submission, a substantial amount of cryptocurrency derivatives trading takes place on exchanges with KYC requirements less strict than BitMEX's or with no KYC requirements at all. The KYC program implemented in 2020 advanced the Company's and the founders' ongoing goal of ensuring that BitMEX is the most trusted, reliable, and secure trading platform in the industry.

### D. Mr. Reed's Positive Impact on Others

Mr. Reed is a dedicated and hardworking technologist and computer programmer. Despite his accomplishments, Mr. Reed still possesses the values instilled in him growing up in "a classic [M]idwestern town." PSR ¶ 85. Unlike his co-founders and many others in the cryptocurrency industry, Mr. Reed is a private and modest person. He keeps to himself and his loved ones and has sought to avoid the public spotlight. As the letters provided in support of Mr. Reed consistently show, he has remained a humble and thoughtful person, who cares deeply for ██████████████████, his longtime friends, and his community.

### 1.   Mr. Reed's Commitment to Family

Mr. Reed is and has always been a devoted family man. PSR ¶¶ 90-91. █████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

**LATHAM&WATKINS**LLP

Mr. Reed "is known for his compassion, generosity and caring," Ex. C at 2, among his "huge circle of supportive family members." Ex. D at 2. Mr. Reed does not live a lavish lifestyle; instead, he uses his earnings to support his extended family. Ex. G at 2. While their financial circumstances have changed since they first met, Mrs. Reed observes that Mr. Reed "continues to be modest, humble and private." *Id.* As Mr. Reed's grandmother writes, "every niece and nephew has had a fund established [by Mr. Reed] in their name to take care of their higher educations." Ex. C at 2. In addition, Mr. Reed moved ██████████ to the Boston area, which they could not have otherwise afforded, and also offered financial assistance to ██ ██████████ so that he could start his own real estate renovation business. Ex. G at 2. Mr. Reed welcomed ████████████████████████ for an extended period during the COVID pandemic. *Id.* According to ████████████, "it was in large part through Sam's influence" that ██████████ "took a more responsible approach to his education." *Id.*

████████████████████████████████████
██████████████████████████████████████
█████████████████████████████████
██████████████████████████████████
████████████████████████████████████
████████████████████████████████
██████████████████████████████████
███████████████████████████████
████████████████████████████████████
█████████████████████████████
████████████████████

██████████████████████████████
█████████████████████████████████
█████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████

### 2.    Mr. Reed's Commitment to Friends

Along with his devotion to his family, Mr. Reed is deeply committed to his "many and diverse" friends, Ex. C at 1-2, whom he "has always had a lot of support from" and "remains

**LATHAM&WATKINS**LLP

close to." Ex. D at 2.  Mr. Reed's kindness, reliability, trustworthiness, and generosity has led many of his friends to turn to him in times of personal struggle.  *See, e.g.*, Ex. F at 1.

 For instance, a few years ago, when one of Mr. Reed's "oldest and closet friends," ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ she explains that Mr. Reed "made it a priority to fly in and spend a weekend with [her]." Ex. K at 1.  She noted that Mr. Reed "showed up . . . wearing an old t-shirt from high school and willing to help me however he could," which included "clean[ing] the dust bunnies from under [her] bed]; a chore that [she] was unable to do [her]self but was too embarrassed to ask of anyone else."  *Id.*  She notes, "[t]hat is who Sam is – a man who is genuine, and a man who cares; who shuns pretentiousness and remains the solid friend you've always relied on."  *Id.*

 Mr. Reed's friends have also sought his guidance when facing professional challenges because of his unparalleled programming acumen and the fact that he is "always willing to help." Ex. J at 1.  Mr. Reed's friend of over a decade, Mr. Perkins, is a ▮▮▮▮▮▮ U.S. Army veteran who served in Iraq and Afghanistan and now runs a small software development company. Ex. F at 1. He writes that Mr. Reed "selflessly devoted many hours of his time to help [Mr. Perkins] learn some of the harder aspects of software development," and that Mr. Reed "is one of the major reasons [Mr. Perkins] has been successful."  *Id.*  Mr. Perkins adds that at the co-working space in Washington, D.C. where he and Mr. Reed first met, Mr. Reed "regularly devoted time to help [other] new and old members [at the space] with their technology problems."  *Id.*  According to Mr. Perkins, "[h]alf the software and hardware at the coworking space only worked because [Mr. Reed] took the time to figure it out."  *Id.*

 Mr. Reed's friend of many years and fellow programmer Julio Santos similarly writes that he is "grateful for [Mr. Reed's] input on [his] work, which [Mr. Reed] doled out with no transactional expectations."  Instead, Mr. Reed's "reward is simply knowing he can help others get better" at programming.  Ex. L at 2.  Mr. Reed's friend Brian McDaniel echoes these sentiments more broadly, writing that Mr. Reed "spent several hours with [him] over multiple phone calls to help [him] work through [a] tough [career] decision."  Ex. J at 1.  As Mr. Reed's friends agree, "[h]is financial success has not changed him; Sam is and has always been a good man and a great friend."  Ex. K at 1.

   3. <u>Mr. Reed's Contributions to His Community</u>

 Mr. Reed is also steadfast in his dedication to his community.  Mr. Reed has never forgotten where he came from and he has been generous in his efforts to give back, with charitable contributions and community involvement preceding the charges in this case.  For example, in May 2020, in lieu of receiving salary as a director, Mr. Reed prompted the Company to donate the corresponding amount anonymously to a food charity.  He has also donated funds to the City Champs Foundation, a non-profit organization that brings martial arts and boxing education to underserved youth in Milwaukee, Wisconsin.

 In addition, in 2019, Mr. Reed invested in Emote Education Inc., an early education company that runs a mobile application for teachers and students to monitor student mental health and emotional well-being.  PSR ¶ 106. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

LATHAM&WATKINS LLP

 As a young father, it is Mr. Reed's hope that Emote Education will help create safe environments for children to thrive. *See id.* ¶ 91.

Mr. Reed is also "a patron for open source software." Ex. H at 2. Mr. Qiu writes of Mr. Reed's "appreciation for code" and "effervescent intensity for software." *Id*. at 1. He remarks that Mr. Reed's "passion translated into a commitment for the open source community." *Id*. Indeed, Mr. Reed currently maintains more than 40 non-financial open source coding projects, some of which are used by Amazon and other large companies and are downloaded millions of times each week.[4] According to Mr. Qiu, "[o]ne does not contribute freely to open source projects without compassion and dedication," and Mr. Reed's "contributions continue to this day for free software that is available for anyone." Ex. H at 2.

Mr. Reed has also been a driving force for open-source software support at BitMEX. Through Mr. Reed's urging, BitMEX became the largest supporter of Bitcoin Core developers, establishing a grant program that continues to this day. For example, this program has given $500,000 to the MIT Digital Currency Initiative, to be used to support students and individuals who are working on meaningful Bitcoin projects. Mr. Reed also prompted BitMEX to give significant grants to individual developers working on non-financial programming projects from which BitMEX benefitted. For example, BitMEX now provides a monthly stipend to Alexander Hultman, a developer of a novel low-latency messaging library that BitMEX has incorporated into its architecture. *See 100X Group Provides Grants of Over $215,000 to μWebSockets Developer Alex Hultman*, BITMEX RESEARCH (Nov. 30, 2020), available at https://blog.bitmex.com/100x-group-provides-grants-of-over-us86000-to-%C2%B5websockets-developer-alex-hultman/.

As should be evident from all these endeavors and the numerous letters supporting him, Mr. Reed deeply values those around him, including both loved ones and community members alike. Mr. Reed's friends and family describe him as a "kind, thoughtful, [and] smart" man with "a strong moral compass," PSR ¶ 90, and they are "confident he will remain a steadfast husband, loving father, generous citizen and supportive friend." Ex. L at 1. They also observe that he "has taken responsibility for the charge" against him, Ex. D at 1, and has "reflect[ed] on his

---

[4] *See, e.g.*, https://www.npmjs.com/package/async-limiter (code project downloaded 11.2 million times per week); https://www.npmjs.com/package/react-draggable (code project downloaded 3.38 million times per week).

LATHAM&WATKINS LLP

actions," Ex. L at 1, and that he has "learned many difficult lessons over the last few years" and "will carry those lessons with him for the rest of his life." Ex. G at 3.

### E.    Mr. Reed's Current Projects and Future Plans

Given his abilities, his young age, and his wide-ranging interests, Mr. Reed is poised to do great things in the years to come. Ex. C at 2.

As noted, in late 2019, Mr. Reed invested in Emote Education Inc., an early education company that runs a mobile application supporting student mental and emotional health and wellbeing. PSR ¶ 106.



As noted, Mr. Reed has also continued his extensive contributions to the open-source coding community in ways that benefit businesses and computer users around the world. Ex. H at 1-2.

## III.    THE OFFENSE CONDUCT

Defense counsel and the government agree on the stipulated sentencing guidelines range set forth in Mr. Reed's plea agreement. PSR ¶ 5. Where the parties do not agree on the PSR's characterization of the offense conduct, the PSR has, in large part, incorporated both parties' positions into its narrative for the Court's review. *Id.* ¶¶ 36-46. We respectfully submit that certain aspects of the PSR's narrative reflect the government's one-sided view of the offense. *See id.* ¶ 10.[5] But rather than attempt to resolve all of the parties' conflicting views here, we ask that the Court take into account a handful of key considerations.

### A.    Mr. Reed Is Differently Situated and Less Culpable Than His Co-Founders

The PSR, the government, and the defense all agree that Mr. Reed is differently situated from his co-founders and had a more limited role in the offense conduct at issue. As reflected in his plea allocution, Mr. Reed has admitted that despite knowing about the presence of U.S. users on BitMEX and a legal requirement to have an AML program, as chief technology officer of the company, he failed to implement such a program, thereby helping to cause the BSA violations. Reed Plea Hr'g Tr. at 26: 8-10, 27:18-20 (Mar. 9, 2022). But while Messrs. Hayes and Delo "were critical organizers and leaders of the criminal decision not to implement an AML program

---

[5] Mr. Reed's objections to the PSR, which include defense counsel's separate summary of the nature of the offense, are included in the PSR at pages 30-40.

LATHAM&WATKINS LLP

at BitMEX," particularly given their "backgrounds in financial services," PSR ¶ 56, Mr. Reed was different.  As the PSR notes, "*he did not have a day-to-day supervisory role over the BitMEX employees who continued to carry out the criminal failure to implement an AML program*.  The Government maintains that while REED had a supervisory role within BitMEX, *it was not a supervisory role in connection with the criminal activity*."  PSR ¶ 57 (emphasis added).  The government's stipulated Sentencing Guidelines range in Zone A, with no leadership enhancement, reflects that Mr. Reed is less culpable than his co-founders, both of whom were subject to a Guidelines range in Zone B.  Ex. A.

The PSR accurately notes that Mr. Reed "focused on BitMEX's technological decisions" and did not have a "supervisory role in connection with" the Company's BSA failures.  PSR ¶ 57.  Throughout his tenure at the Company, Mr. Reed focused on computer programming and maintenance of the BitMEX website and servers.  Given his lack of experience in finance, trading, or regulatory compliance, Mr. Reed's views on the regulatory framework applicable to BitMEX were informed by Mr. Hayes and the professionals Mr. Hayes consulted.[6]  Mr. Hayes and Mr. Delo were the ones with experience in financial services.  Mr. Reed's role at the Company did not include interfacing with regulators or engaging with attorneys on regulatory questions or compliance.  He relied on others—specifically, Mr. Hayes—to determine what compliance measures should be adopted.  The PSR and his plea agreement with the government both recognize this important distinction.

Further, Mr. Reed had a much lesser role than his co-founders in the Company's business development and marketing activities.  And while he generally had no customer-facing role at all, Mr. Reed's limited interactions with customers—mostly during the early days of the Company when it had minimal customer support capacity—show him trying to enforce BitMEX's restrictions.  ███████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████

## B.    Other Specific Allegations Relating to Mr. Reed Are Unsupported

Beyond the core fact that Mr. Reed is differently situated and less culpable than his co-founders—on which all parties agree—there are aspects of the PSR that unduly favor the government's one-sided view.

*First*, the PSR, like the government, characterizes the Company's geographic restrictions as a sham, but as this Court has recognized, those measures—while admittedly insufficient—were real and succeeded in keeping thousands of U.S. persons off the platform.  Delo Sentencing

---

[6] For instance, Mr. Hayes worked with Sullivan & Cromwell LLP as Company counsel and went with them to meet proactively with the CFTC in 2018 to discuss potential registration in the U.S.  Mr. Reed did not attend those meetings and heard about them afterward.

**LATHAM&WATKINS**LLP

Hr'g Tr. at 26:8-11 (June 15, 2022).  As detailed above, Mr. Reed and his co-founders took proactive steps to prevent U.S. persons from trading on BitMEX by implementing technological measures and restrictions that became increasingly sophisticated over time.  Mr. Reed has admitted that the geographic controls did not block all U.S. users, but that does not erase the fact that the controls had a meaningful impact in reducing the number of U.S. persons trading on BitMEX.  *See* Ex. N at ¶¶ 7, 8(a) (defense expert analysis showing, among other things, that BitMEX's geographic restrictions successfully blocked tens of thousands of potential users from the U.S., and estimating conservatively that BitMEX forewent more than $100 million in revenue as a result).  The restrictions were flawed and imperfect, but the facts belie the government's rhetoric that they were a sham.

    *Second*, while the PSR echoes the government in asserting that BitMEX allowed VPNs as a loophole to undermine its controls, BitMEX in fact explicitly prohibited the use of VPNs to misrepresent location, and Mr. Reed himself warned users about this practice.



VPN usage may have been a known challenge, and Mr. Reed has acknowledged that the Company should have done more to address such challenges, but the record on this point is not one-sided as the government has suggested.

    *Third*, the allegation that a short-lived Tor "hidden service" was intentionally designed as a loophole or that Mr. Reed "took additional steps designed to . . . evade" the platform's controls by launching a Tor service contains multiple factual errors.  Indictment ¶ 28; PSR ¶ 30.  Tor is a tool that was largely created through funding from the United States government in the 1990s and early 2000s, including from the Naval Research Lab and the Defense Advanced Research Projects Agency.  Tor gives citizens in censored nations a tool to bypass censorship.  Indeed, a person can legally access any website on the internet via a Tor-enabled web browser.  Contrary to the government's and PSR's assertions, a Tor "hidden service" is unnecessary for a user to access a website through Tor.  Rather, a "hidden service" is simply a node that adds another level of online security and privacy for the user.

    In any event, BitMEX implemented this Tor "hidden service" on September 9, 2015—*before* the CFTC's first pronouncement that Bitcoin is a commodity, *before* BitMEX implemented its U.S. user ban, and *before* the Indictment period.  Thus, there were no controls to "evade," and the Company removed the Tor "hidden service" shortly thereafter in November 2015.  This sequence of events belies the argument that the service was implemented as a workaround.

    *Fourth*, the government also alleges that Mr. Reed "allowed a friend of his who he knew resided in the United States to continue to access BitMEX's platform up to and including at least in or about October 2018."  Indictment ¶ 26; *see also* PSR ¶ 28.  This user (identified as "User-

LATHAM&WATKINS LLP

3" in the PSR) was a childhood friend who joined the site before any CFTC pronouncements about Bitcoin or BitMEX's ban of U.S. users. PSR ¶ 28. User-3 gave helpful feedback on user experience on the BitMEX website during its early days. That he may have continued using the platform too long thereafter simply confirms that the Company's restrictions were insufficient (which Mr. Reed has acknowledged), not that they were a sham, particularly when those measures succeeded in restricting thousands of other users. In addition, the allegations in the PSR about Mr. Reed's usage of BitMEX's Trollbox chat function in 2014 and 2015, or about his meeting with "User-4" in Milwaukee in August 2015 (*id.*), predate the charged period and should not have any bearing on Mr. Reed's sentencing.

*Fifth*, the government alleged in the Indictment, and is expected to raise again at sentencing, that Mr. Reed "falsely denied knowing that BitMEX maintained reports identifying U.S. customers on the platform" when "in fact, in or about December 2018, REED received a report dated in or about October 2018 which showed trading revenue attributable to U.S. customers." *See* Indictment ¶ 27; PSR ¶ 23. Respectfully, this allegation has always been misguided. The December 2018 "report" at issue, created after the Company had implemented enhanced measures to detect and block U.S. persons, *see supra* at 8, indicated a total of just 20 U.S. users, out of more than 90,000 users listed in the document. An employee created this document on his own initiative using his own approach to data that Mr. Reed had not seen before. Mr. Reed received it while on sabbatical, and the contemporaneous communications show that he thought it was erroneous. ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

*Finally*, the PSR echoes the government's view that BitMEX's lack of a BSA-compliant AML/KYC program allowed money laundering on the platform. PSR ¶ 18. For its part, the government has made this point in grander fashion, both to the Court, *see* ECF No. 334 at 4 (stating in response to Mr. Hayes' sentencing submission that "BitMEX became a tool for money laundering and criminal activity"), and in press releases, *see* U.S. Attorney's Office Press Release (Mar. 9, 2022), available at https://www.justice.gov/usao-sdny/pr/third-founder-

---

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

LATHAM&WATKINS LLP

cryptocurrency-exchange-pleads-guilty-bank-secrecy-act-violations (asserting that "BitMEX was in effect a money laundering platform").

Respectfully, these hyperbolic assertions are unfounded. As an initial matter, there is no factual basis to contend that Mr. Reed or his co-founders affirmatively allowed or condoned money laundering on BitMEX. To the contrary, the founders built BitMEX to be a secure and trusted trading platform. From the perspective of an engineer like Mr. Reed, BitMEX had multiple innovative features that made it a uniquely poor venue for money laundering. As noted above, these included using wallet addresses beginning with a unique prefix (3BMEX) that made every deposit or withdrawal from BitMEX identifiable on the immutable public blockchain—an inherent deterrent to would-be money launderers. And unlike other platforms, BitMEX limited user withdrawals to once per day. BitMEX also used special high-security addresses, called "multisignature" wallets, across 100% of its addresses, which increases security at the cost of on-chain fees and speed. And importantly, the founders built BitMEX as a Bitcoin-in/Bitcoin-out only platform, which did not handle fiat currency and did not allow Bitcoin to be exchanged for any other currency or converted to any other form of value. This unique—and uniquely narrow—business model meant that users could only deposit Bitcoin and withdraw Bitcoin.[8] Mr. Reed has acknowledged his responsibility for BitMEX's failure to implement and maintain an AML program required by the BSA. But that does not mean he thought or desired that BitMEX would be a platform for money laundering. He did not.

As the Court observed during the sentencing of Mr. Hayes, the Guidelines range flows from the offense charged by the government and the offense to which the defendant pleaded guilty. Hayes Sentencing Hr'g. Tr. at 54:15-24 (May 20, 2022). Mr. Reed has acknowledged his offense and its seriousness, but the government's effort through such assertions to make it something more than it was should be discounted.

## C.    The Court Should Not Consider Uncharged Conduct

The PSR references three categories of alleged uncharged conduct: "Failure to File SARs," "Sanctioned Jurisdiction," and "Other Misrepresentations." PSR ¶¶ 41-51. Respectfully, none of these categories should be considered in connection with sentencing.

*First*, while BitMEX did not file SARs with FinCEN, this conduct is already encompassed in the guilty plea of failing to implement a BSA-complaint AML program, which requires SARs to be filed. *See* 31 C.F.R. § 1026.210(b)(5) (requirements of BSA-compliant

_____

[8] In response to BitMEX's unique implementation of these myriad features that increased security and reliability at the cost of convenience and anonymity, the government argues only that "there is no evidence that the measures . . . were intended to discourage money laundering or did in fact discourage money laundering." Gov't Resps. to Def. Reed's Objs. to Initial PSR (May 27, 2022). But this argument misses the point. For someone like Mr. Reed—an engineer with no prior experience in the financial industry or in compliance—structural features that lead to slower transactions, public traceability, and an inability to convert currencies would make BitMEX uniquely undesirable for laundering. Such measures, which are built into the platform's design, provide important context and reason for him to believe that the platform would not be attractive to someone looking for a place to engage in improper transactions.

LATHAM&WATKINS LLP

AML program include implementation of "appropriate risk-based procedures for conducting ongoing customer due diligence" including "[c]onducting ongoing monitoring to identify and report suspicious transactions").  Further, as the government concedes, BitMEX did file SARs with authorities in the Seychelles, the home jurisdiction for the holding company of BitMEX.  *See* PSR ¶ 42.  The Company's failure to file contemporaneous reports with U.S. authorities does not constitute a freestanding consideration for sentencing.[9]

*Second*, the PSR observes that internal BitMEX reports shared with the three founders showed that BitMEX earned revenue from customers in sanctioned countries.  *Id.* ¶ 46.  But BitMEX first became aware that it was required to enforce U.S. sanctions in late 2017, and sought legal advice regarding sanctions regulations applicable to its business.  BitMEX then promptly revised its terms of service to ban customers from sanctioned jurisdictions and communicated this new corporate policy repeatedly.  Over time, BitMEX improved the controls to block customers from sanctioned jurisdictions, including regularly identifying and blocking customers suspected of trading from sanctioned jurisdictions.  Mr. Reed helped to write and implement control improvements and never authorized, condoned, or encouraged any customer from a sanctioned jurisdiction to trade on the BitMEX platform.  *Id.* ¶ 46(a).

*Third*, the PSR states that Messrs. Hayes, Delo, and Dwyer made false statements to a bank.  *Id.* ¶¶ 47-51.  But as the government concedes—and the PSR itself reflects—there is no basis to link Mr. Reed to this alleged conduct.  Indeed, the government has never alleged any connection between Mr. Reed and this conduct.  Uncharged conduct related only to Mr. Reed's co-defendants is inapplicable to Mr. Reed and irrelevant to his sentencing.

## IV.    MR. REED SHOULD BE SENTENCED TO TIME SERVED

Based on all of the foregoing considerations and applicable law, we respectfully request that the Court sentence Mr. Reed to time served.

### A.    Applicable Law

As the Court knows, a sentence must be "sufficient, but not greater than necessary," to accomplish the specified goals of sentencing.  18 U.S.C. § 3553(a)(1)-(2); *see Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  The first step in a sentencing proceeding is the calculation of the applicable Guidelines range.  *Peugh v. United States*, 569 U.S. 530, 536 (2013) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).  The applicable Guidelines range "should be the starting point and the initial benchmark."  *Id*.  The sentencing court must take the second step of considering "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), to make an "individualized assessment" of an appropriate sentence under the statute.  *Gall*, 552 U.S. at 50.

---

[9] Regarding the incident involving a German customer described in paragraphs 43 and 44 of the PSR, the PSR simply notes that Mr. Reed was a recipient of an email, not that he was or (in light of his role) should have been involved in handling the matter, which was addressed by Mr. Hayes.  PSR ¶ 43-44.

LATHAM&WATKINS LLP

B.    **The Stipulated Sentencing Guidelines**

Mr. Reed and the government entered a plea agreement with a stipulated Guidelines range of 0-6 months (Zone A), based on a stipulated offense level of 6, with no enhancements, and Criminal History Category I.  PSR PDF Pg. 43.  Mr. Reed and the government also agreed on a stipulated fine of $10 million, which is significantly higher than the Guidelines advisory range of $1,000 to $9,500.  *Id.* ¶ 5(c)(ii)-(iii).  Under the plea agreement, the stipulated fine is fully satisfied by the $10 million civil penalty that Mr. Reed paid to the CFTC.  The Probation Office concurs with the Guidelines calculations recited in the plea agreement and summarized here.  *Id.* ¶ 5.

A sentence of time served is appropriate given Mr. Reed's stipulated 0-6 months Guidelines range and mitigating factors, including, as discussed further below, that Mr. Reed has no criminal history and has pleaded guilty to a single regulatory compliance offense that suggests no risk of future crimes and for which he has already suffered significant financial and reputational harm.

Any greater sentence—including any sentence imposing incarceration or home confinement—would be unwarranted and disproportionate considering Mr. Reed's unique history and circumstances and would be "greater than necessary" to satisfy the § 3553(a)(2) factors.  Given the defendants' relative culpability and distinct role in the offense conduct, PSR ¶¶ 56-57, such a sentence would also be inappropriate in light of the Court's sentencing of Mr. Hayes to two years of probation with six months of home confinement, Hayes Sentencing Hr'g Tr. at 56:2-8, 59:18-60:10 (May 20, 2022), and the Court's sentencing of Mr. Delo to 30 months of probation with no home confinement, Delo Sentencing Hr'g at Tr. 31:16-20 (June 15, 2022).  As reflected in his plea agreement with the government, Mr. Reed is less culpable and should receive a lesser sentence.  Further, as noted in the PSR, the Court may consider a sentence outside of the stipulated Guidelines range based on Mr. Reed's "lack of criminal history, his willingness to remit a hefty fine prior to sentencing, his compliance with pretrial supervision and his familial obligations."  PSR ¶ 135 (citing 18 U.S.C. § 3553(a)).

C.    **18 U.S.C. § 3553(a)(1) Factors**

1.    The Nature and Circumstances of the Offense

The offense to which Mr. Reed pleaded guilty is a single count of causing BitMEX to fail to adopt an AML program as required by the BSA.  Mr. Reed acknowledges that causing BitMEX to fail to meet the requirements of the BSA is a serious offense.  But it should also be noted that causing an entity to fail to maintain an adequate AML program is not of the same nature as money laundering itself.  The government has repeatedly tried to blur this line by arguing, for example, that "BitMEX became a tool for money laundering and criminal activity." ECF No. 334 at 4.  For the reasons stated above, such inflammatory rhetoric should be ignored in assessing the nature of Mr. Reed's offense.  The government has never alleged that Mr. Reed encouraged or condoned money laundering or any other illicit conduct on BitMEX.

LATHAM&WATKINS LLP

It is also important to note, as this Court observed at Mr. Hayes's and Mr. Delo's sentencings, that the offense caused no loss or harm to any victim. PSR ¶ 60; Hayes Sentencing Hr'g Tr. at 54:25-55:1, 56:20-21 (May 20, 2022); Delo Sentencing Hr'g Tr. at 26:17-19 (June 15, 2022). While causing BitMEX to violate the BSA is a significant violation of law, it was not a crime undertaken with the intent or effect of harming others. We respectfully ask the Court to consider that fact in assessing the nature of the offense.

Several mitigating circumstances of the offense also bear note. *First*, as we have respectfully raised in prior motion practice, this is a first-of-its-kind criminal prosecution that rests on a novel legal theory based on two highly technical statutory regimes. Individual charges for causing an entity's AML failure have few precedents (and *none* based on the AML duties of an FCM). We are aware of only a handful of instances of criminal prosecutions of individuals under the BSA, and in each of those cases the individuals charged were directly responsible for the institution's compliance function. *See, e.g.*, *United States v. Miller*, 2:13-cr-445 (E.D. Pa. Sept. 11, 2013); *United States v. Goletiani*, 1:11-cr-591 (E.D.N.Y June 20, 2011). Enforcement of the BSA's AML provisions against individuals tends to be through civil enforcement actions, and even then, charges are typically directed only against individuals with direct responsibility for the institution's compliance functions. *See, e.g.*, *FinCEN Assesses $1 Million Penalty and Seeks to Bar Former MoneyGram Executive from Financial Industry*, FINCEN (Dec. 18, 2014), available at https://www.fincen.gov/news/news-releases/fincen-assesses-1-million-penalty-and-seeks-bar-former-moneygram-executive; *In re McKenna*, Exchange Act Release No. 82957 (Mar. 28, 2018), available at https://www.sec.gov/litigation/admin/2018/34-82957.pdf; Al Barbarino, *FINRA Fines Ex-Interactive Brokers CCO Over AML Lapses*, LAW360 (Feb. 11, 2022), available at https://www.law360.com/articles/1464582/finra-fines-ex-interactive-brokers-ccoover-aml-lapses. We respectfully submit that Mr. Reed's sentence should reflect that this is an atypical criminal enforcement of a novel, stand-alone BSA charge against an individual defendant who was not the person responsible for regulatory compliance.

*Second*, the sentence should take account of the fact that BitMEX was a true startup built by the founders from laptops in their living rooms. Although it has matured as a business and now has hundreds of employees, BitMEX had humble beginnings. And though it does not excuse the offense, Mr. Reed worked to build this business as best as he could with no experience and limited resources, against the backdrop of an evolving regulatory environment. Years of effort to build a safe and reliable web-based platform left Mr. Reed exhausted and in need of a sabbatical, stepping away from the Company for several months in 2018-2019. When the Company achieved sufficient growth to hire additional employees, Mr. Reed and his co-founders hired experienced and qualified managers, including in the legal and compliance functions, who helped the Company become an industry leader in compliance. And when Mr. Reed returned from sabbatical in a non-executive role, he helped to develop the Company's effort in 2019-2020 to implement comprehensive KYC.

*Third*, as discussed above, Mr. Reed had little day-to-day involvement in the functions of the business relating to regulatory compliance and was not a critical organizer or leader of the failure to implement an AML program at BitMEX. *See* PSR ¶¶ 56-57. As the government and Probation have acknowledged, Mr. Reed did not have a supervisory role over BitMEX functions

LATHAM&WATKINS LLP

responsible for the failure to have an AML program.  Indeed, Mr. Reed was even on sabbatical for about six months of the charged period (September 2018 to February 2019), during which he had no direct, day-to-day involvement managing *any* function at BitMEX.  Thus, although Mr. Reed knew BitMEX did not have a proper AML program and has taken responsibility for his role in causing that failure, it was a more limited role than that of his co-founders.  *Id.*

2.    Mr. Reed's History and Characteristics

Mr. Reed's character and record as a hardworking, selfless contributor to his community reinforce the requested sentence of time served.  Mr. Reed was a precocious child, who excelled in school and fell in love with computer programming.  He used his exceptional talents productively, to help others and build businesses.  As noted earlier, even while working endless hours to build BitMEX's front-end systems and to maintain them as BitMEX rapidly grew, Mr. Reed still maintained an active commitment to open-source coding projects unrelated to BitMEX.  He is tireless in his desire to learn and improve and he uses his talents to help others.

Further, while Mr. Reed's work yielded financial success, he has conducted himself with humility and grace.  Unlike many other successful cryptocurrency entrepreneurs, Mr. Reed has shunned the spotlight and instead used his success quietly to support and spend more time with close friends and family.  Rather than remain in Hong Kong, Mr. Reed left his co-founders behind for small-town life near family in Wisconsin and later Massachusetts.  In both places, he focused on ███████████████ against the backdrop of both the criminal charges and the global pandemic.  As his family attests, as successful as Mr. Reed has been in computer science and business, "more than anything else Sam has excelled in is in being a father."  Ex. C at 2.

Not only does Mr. Reed's family-man lifestyle reflect his warm and humble character, but so too does his selfless support of others.  Mr. Reed has always sought to use his skills and fortunate position to help ensure better lives for others, often focusing on education.  He has set up funds for the education of his nieces and nephews, and he has invested in a company that seeks to use technology to support student mental health and well-being in schools.

We respectfully submit that an appropriate sentence should reflect Mr. Reed's upright, laudable character, and his many contributions to his family, friends, and community.

**D.    18 U.S.C. § 3553(a)(2) Factors**

1.    Seriousness of the Offense, Respect for the Law, and Just Punishment

Violating the BSA is a serious offense, and Mr. Reed has admitted his role.  But promoting respect and imposing a just punishment means adopting an appropriate sentence based on the circumstances.  As noted by the Supreme Court in *Gall*, an overly harsh sentence "may work to promote not respect, but derision of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."  552 U.S. at 54.

LATHAM&WATKINSᴸᴸᴾ

Mr. Reed's conduct demonstrates that a sentence of time served is appropriate. Criminal liability for causing BitMEX's failure to have an AML program is novel, and both the government and probation agree that Mr. Reed was neither an organizer nor a leader of the offense conduct. PSR ¶¶ 56-57. Further, Mr. Reed has shown throughout his otherwise law-abiding life that he respects the law, and his actions and comportment post-arrest have demonstrated this as well. Mr. Reed has suffered personally, professionally, and financially already, and he agreed to a substantial financial penalty dramatically above the Guidelines fine range. Accordingly, we respectfully submit that a sentence of time served is a just sentence.

      2.   <u>Deterrence</u>

With respect to specific deterrence, we respectfully submit that Mr. Reed presents a uniquely low risk of recidivism given his total absence of any prior criminal history, his upstanding and moral character and personal history, and the significant impact this highly publicized matter has already had on his life. Indeed, Mr. Reed has already paid the significant sum of $10 million and, as an owner of BitMEX's holding company, bore a portion of the economic impact of the Company's $100 million civil settlement. He has also endured 21 months under the weight of the charges and the conditions of his pretrial release, which limited him to travel in a small number of U.S. states, even as his co-defendants lived and traveled abroad without any geographic restrictions.[10] His record of compliance while on bail pending resolution of the charges has been exemplary.

With respect to general deterrence, this matter has been a high-profile, landmark case, and a rare example of prosecution of individuals under the BSA—thus the charging of this case alone functions as a significant deterrent, regardless of the sentences imposed. General deterrence is not furthered by imposing an unduly harsh sentence on Mr. Reed, whom the government concedes was not an organizer or leader of the offense conduct.

      3.   <u>Protection of the Public</u>

A sentence of time served will not jeopardize the public in any way. Not only was the offense at issue one without victims, PSR ¶ 60, but there is no basis to conclude that Mr. Reed presents any risk to the public.

      4.   <u>Needed Training or Rehabilitation</u>

Mr. Reed is an extremely well-adjusted, capable, and productive member of society and has no need for training or rehabilitation of any kind.

---

[10] Mr. Reed is also the only one of the three founders who had to surrender his passport, even though he presented no flight risk. *See* Order Setting Conditions of Release at 2, *United States v. Samuel Reed*, No. 1:20-mj-02501 (D. Mass. Oct. 1, 2020), ECF No. 7.

LATHAM&WATKINS LLP

### E.    The Sentences Imposed on Co-Defendants

The sentences imposed on Mr. Reed's co-defendants counsel in favor of a lesser sentence for Mr. Reed. While the crime to which all three defendants pled guilty is the same, the circumstances of their individual involvement with BitMEX's marketing and compliance functions generally and with respect to causing BitMEX's failure to maintain an AML program are markedly different. At Mr. Delo's sentencing hearing, the Court recognized the importance of sentencing each defendant in accordance with his own conduct, and noted the significance in that regard of the fact that Mr. Hayes had more responsibility than Mr. Delo over BitMEX's marketing and compliance. *See* Delo Sentencing Hr'g Tr. at 27:15-20 (June 15, 2022). Ultimately, the Court sentenced Mr. Delo to a 30-month probationary sentence rather than the 24-month probation and 6-month home confinement sentence Mr. Hayes received. *See id.* at 27:15-20, 31:16-20; Hayes Sentencing Hr'g Tr. at 56:2-8, 59:18-60:10 (May 20, 2022).

The distinguishable nature of Mr. Reed's conduct is even clearer. His purview at BitMEX was the narrowest of the founders and had the least overlap with the marketing and compliance decisions that led to BitMEX's failure to maintain an adequate AML program. As both the government and Probation have acknowledged, unlike Messrs. Hayes and Delo, Mr. Reed was not a critical organizer or leader of the failure to implement an AML program, did not play a supervisory role in connection with the offense conduct, and did not "have a day-to-day supervisory role over the BitMEX employees who continued to carry out the criminal failure to implement an AML program." PSR ¶¶ 56-57. These differences explain why Mr. Reed's plea agreement includes a lower offense level and guidelines zone than his two co-founders. Respectfully, we submit that in order to reflect the differences in Mr. Reed's role and conduct, his sentence should be significantly below his co-defendants' sentences. For these reasons, a sentence of time served for Mr. Reed is adequate and appropriate.[11]

Further, a sentence of time served should be imposed with no period of supervised release. Under U.S.S.G. § 5D1.1(a), supervised release is mandatory only where specifically required by statute or where a term of more than one year imprisonment is imposed. Neither condition would apply to a sentence of time served here. Supervised release is also unnecessary given the relevant facts and circumstances. The Guidelines note that in determining whether to impose a term of supervised release, courts must consider "(i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to

---

[11] Any term of home confinement would be both unnecessary given the stipulated guidelines zone for Mr. Reed and disproportional in light of the sentences imposed on Mr. Reed's co-defendants. Under the Guidelines, whereas a sentence of probation is authorized for a Zone B Guidelines range if accompanied by a condition or conditions requiring "confinement" such as "home detention," no such requirement of confinement exists for a Zone A range. *Compare* U.S.S.G. § 5B1.1(a)(2), *with* U.S.S.G. § 5B1.1(a)(1); *see also United States v. Thorpe*, 191 F.3d 339, 341 (2d Cir. 1999) ("[S]ince the applicable guideline range was in Zone A of the Sentencing Table, the district court was not required to impose any condition of confinement or home detention."). Mr. Reed's stipulated Guidelines range is in Zone A— not Zone B like his co-defendants'—because the facts warranted that difference, and we respectfully submit his sentence should reflect the difference as well.

LATHAM&WATKINS LLP

provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (iv) the need to provide restitution to any victims of the offense."  Appl. Note 3, U.S.S.G. § 5D1.1.  For all of the reasons discussed above, these factors do not counsel in favor of supervised release for Mr. Reed.  He has already spent 21 months fully complying with his pretrial release conditions, which were more onerous than either of his co-defendants' conditions—and, indeed, more onerous even than the terms for their probation—and his compliance with those conditions has been exemplary.  Further post-sentencing restrictions are unnecessary.

To the extent the Court believes a period of supervised release is warranted, we respectfully submit that the conditions of any period of supervised release for Mr. Reed should be consistent with the terms of probation ordered for his co-defendants.  Specifically, like his co-defendants, Mr. Reed should not be subject to any limitations on (1) domestic or international travel or (2) contact with Messrs. Hayes and Delo.  See Hayes Sentencing Hr'g. Tr. at 58:14-18, 61:9-11 (May 20, 2022) (allowing international travel and unrestricted contact with Messrs. Delo and Reed during probation); Delo Sentencing Hr'g. Tr. at 29:11-16, 30:16-31:3 (June 15, 2022) (allowing international travel and unrestricted contact with Messrs. Hayes and Reed during probation).  The term for any period of supervised release should also be as short as possible, particularly in light of the 21 months Mr. Reed has already spent in compliance with restrictive pretrial release conditions.[12]

Finally, we respectfully submit that the two "special conditions" recommended by the PSR—"a search condition based on the defendant's criminal conduct, which included fraudulent activity," and "financial restrictions and disclosure conditions to monitor the defendant's repayment of financial obligations and also to deter the defendant from committing a new offense," PSR PDF Pg. 44—are unfounded.  As explained above, Mr. Reed is not alleged to have engaged in any fraudulent conduct, see supra at 14-17, and he has already fully satisfied the fine stipulated in his plea agreement, see supra at 1, 3.  Neither of these special conditions was imposed on Mr. Hayes or Mr. Delo, and they should not be imposed on Mr. Reed.

## V.    CONCLUSION

For the reasons above, we respectfully request that the Court sentence Mr. Reed to time served with no supervised release.

---

[12] Similarly, in the event the Court determines to order a sentence of probation instead of time served, we respectfully submit that the conditions of probation for Mr. Reed should be no more restrictive than for Mr. Hayes or Mr. Delo, and that under probation too Mr. Reed should be permitted to travel domestically and internationally, without having to seek preapproval.  Any other outcome would result in the unusual circumstance of the least culpable defendant receiving the most punitive conditions simply because he resides in the United States while the others live abroad.  Moreover, for all the reasons discussed above, we respectfully submit that any term of probation should be limited to a period of one year.  See 18 U.S.C. § 3561; U.S.S.G. § 5B1.1(a)(1).

LATHAM&WATKINS LLP

Respectfully submitted,


/s/ Douglas K. Yatter
Douglas K. Yatter
Benjamin Naftalis
Jack McNeily
Iris Xie
of LATHAM & WATKINS LLP

Enclosures

cc:    AUSA Samuel Raymond
       AUSA Thane Rehn
       AUSA Jessica Greenwood

# EXHIBIT A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 4, 2022

Douglas Yatter, Esq.
Benjamin Naftalis, Esq.
Jack McNeily, Esq.
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Douglas.Yatter@lw.com
Benjamin.Naftalis@lw.com
Jack.McNeily@lw.com
Counsel for Samuel Reed

**Re: *United States v. Samuel Reed*, 20 Cr. 500 (JGK)**

Dear Counsel:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Samuel Reed ("the defendant") to Count One of the above-referenced Original Indictment (the "Original Indictment"). Count One charges the defendant with violating the Bank Secrecy Act, in violation of Title 31, United States Code, Sections 5318 and 5322; and Title 31, Code of Federal Regulations, Sections 1026.210 and 1026.220, and carries a maximum term of imprisonment of 5 years, a maximum term of supervised release of 3 years, a maximum fine, pursuant to Title 18, United States Code, Section 3571 of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment.

In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations, if any, as to which this Office cannot, and does not, make any agreement) for his participation in (1) willfully causing and conspiring to cause the failure by a financial institution to implement an anti-money laundering program, in violation of Title 31, United States Code, Sections 5318 and 5322; and Title 31, Code of Federal Regulations, Sections 1026.210, and 1026.220; and Title 18, United States Code, Sections 371 and 2, from September 2015 to in or about December 2020, relating to willfully causing and conspiring to cause HDR Global Trading Ltd., a/k/a "BitMEX," a financial institution operating in the United States, to fail to implement an anti-money laundering program, as charged in Counts One and Two of the Original Indictment and Counts One through Three Hundred and Sixty Seven of the Superseding Indictment, S1 20 Cr. 500; (2) willfully causing and conspiring to cause a financial institution to fail to file suspicious activity reports, in violation of Title 31, United States Code, Sections 5318 and 5322; and Title 31, Code of Federal Regulations, Sections

2021.09.20

1026.320; and Title 18, United States Code, Sections 371 and 2, from September 2015 to in or about December 2020, relating to willfully causing and conspiring to cause HDR Global Trading Ltd., a/k/a "BitMEX," a financial institution operating in the United States, to fail to file suspicious activity reports, including as charged in Count One of the Superseding Indictment, (3) bank fraud, wire fraud, and conspiracy to commit bank and wire fraud, in violation of Title 18, United States Code, Sections 1343, 1344, and 1349, from 2015 through December 2020, relating to misrepresentations to HSBC Hong Kong and HSBC Bank USA, N.A. made in connection with the HSBC Hong Kong bank account held in the name of Shine Effort Inc Limited, and (4) violations of the International Emergency Economic Powers Act, in violation of Title 50, United States Code, Section 1701 and associated provisions and regulations, and Title 18, United States Code, Section 2, from 2014 through December 2020, related to transactions with individuals and entities subject to United States sanctions, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.* In addition, at the time of sentencing, the Government will move to dismiss any open Count(s) against the defendant, including the Superseding Indictment. The defendant agrees that with respect to any and all dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

Pursuant to 18 U.S.C. § 3571(d), the defendant agrees to pay a criminal fine in the amount of $10,000,000 (Ten Million Dollars) in United States Currency, representing pecuniary gain derived by the defendant from the offense (the "Stipulated Fine"). Prior to entering a guilty plea pursuant to this plea agreement, the defendant will transfer the amount of the Stipulated Fine into a United States-based escrow account. The defendant will provide proof of such transfer to the Government. Failure to abide by the foregoing two provisions will be deemed a breach of the plea agreement. The parties agree that the Stipulated Fine shall be reduced by the amount of any penalties paid prior to the date of the defendant's sentencing to the Commodity Futures Trading Commission (the "CFTC") in connection with claims brought against the defendant in the matter of *CFTC v. HDR Global Trading Limited, et al.*, 20 Civ. 8132 (S.D.N.Y.). The defendant shall pay the Stipulated Fine, less any reduction for penalties paid to the CFTC as described above, within ten business days of the sentencing date. The parties agree that the Stipulated Fine is appropriate in light of the factors set forth in 18 U.S.C. §§ 3553(a) and 3572(a). Neither party will in any way suggest to the Probation Office or the Court that a fine amount other than the Stipulated Fine should be entered in this case.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

A. Offense Level

    1.   The Guidelines provisions in effect as of November 1, 2021 apply in this case.

    2.   The Guidelines provision applicable to the crime charged in Count One is U.S.S.G. § 2S1.3. Pursuant to U.S.S.G. § 2S1.3(a)(1), the base offense level is 8.

3.    Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a).

In accordance with the above, the applicable Guidelines offense level is 6.

B. Criminal History Category

Based upon the information now available to this Office (including representations by the defense), the defendant has 0 criminal history points.

In accordance with the above, the defendant's Criminal History Category is I.

C. Sentencing Range

Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 0 to 6 months' imprisonment (the "Stipulated Guidelines Range").  The parties agree that, pursuant to U.S.S.G. § 5E1.2, at Guidelines level 6, the applicable fine range is $1,000 to $9,500.  The parties further agree that an upward departure from the Guidelines fine range to the Stipulated Fine is warranted under U.S.S.G. § 5E1.2 App. Note 4.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted.  Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein.  Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon new information that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement

for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that his entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241, of any sentence within or below the Stipulated Guidelines Range of 0 to 6 months' imprisonment, and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation. The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case. The defendant further agrees not to appeal or bring a collateral challenge of any term of supervised release that is less than or equal to the statutory maximum. The defendant also agrees not to appeal or bring a collateral challenge of any fine that is less than or equal to the Stipulated Fine of $10,000,000, and the Government agrees not to appeal or bring a collateral challenge of any fine that is greater than or equal to the Stipulated Fine of $10,000,000. The defendant also agrees not to appeal or bring a collateral challenge of any special assessment that is less than or equal to $100. Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any

and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, or impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his removal from the United States is presumptively mandatory and that, at a minimum, he is at risk of being removed or suffering other adverse immigration consequences. If the defendant is a naturalized citizen of the United States, he recognizes that pleading guilty may have consequences with respect to the defendant's immigration status. Under federal law, an individual may be subject to denaturalization and removal if his naturalization was procured by concealment of a material fact or by willful misrepresentation, or otherwise illegally procured. The defendant acknowledges that he has discussed the possible immigration consequences (including removal or denaturalization) of his guilty plea and conviction with defense counsel. The defendant affirms that he wants to plead guilty regardless of any immigration or denaturalization consequences that may result from the guilty plea and conviction, even if those consequences include denaturalization and/or removal from the United States. The defendant understands that denaturalization and other immigration consequences are typically the subject of a separate proceeding, and the defendant understands that no one, including his attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration or naturalization status. It is agreed that the defendant will have no right to withdraw his guilty plea based on any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge his conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including removal or denaturalization) resulting from his guilty plea and conviction.

It is further agreed that should the conviction(s) following the defendant's plea(s) of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

2021.09.20

Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By: _____

Samuel Raymond
Jessica Greenwood
Thane Rehn
Assistant United States Attorneys
(212) 637-6519/1090/2354

APPROVED:

_____

Alexander J. Wilson
Chief, Money Laundering & Transnational
Criminal Enterprises Unit

AGREED AND CONSENTED TO:

_____
Samuel Reed

3/4/22
DATE

APPROVED:

_____
Douglas Yatter, Esq.
Benjamin Naftalis, Esq.
Jack McNeily, Esq.
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attorneys for Samuel Reed

3/4/22
DATE

2021.09.20

# EXHIBIT B

| | |
|---|---|
| **From:** | Xie, Iris (NY) |
| **Sent:** | Wednesday, May 11, 2022 5:04 PM |
| **To:** | 9-AMC-AR-CFTC (FAA |
| **Cc:** | Yatter, Douglas (NY); Naftalis, Benjamin (NY); McNeily, Jack (CH); Pendleton, Elizabeth; Metzger, Carlin; Platt, Joseph |
| **Subject:** | CFTC v. HDR Global Trading Limited, et al., Case No. 1:20-cv-08132 |
| **Attachments:** | 2022.05.11 - CFTC Reed CMP Cover Letter and Confirmation.pdf |

Dear Ms. King,

Please see the attached cover letter, which is being provided pursuant to paragraph 38 of the Consent Order entered against Defendant Samuel Reed in the above-referenced matter (ECF No. 91).

Please do not hesitate to contact us if there are any questions.  Thank you.

Best regards,
Iris

**Hanyu (Iris) Xie**

**LATHAM & WATKINS** LLP
1271 Avenue of the Americas | New York, NY 10020
D: +1.212.906.4530

**Douglas K. Yatter**
Direct Dial: (212) 906-1211
douglas.yatter@lw.com

1271 Avenue of the Americas
New York, New York  10020-1401
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Moscow |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Shanghai |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

May 11, 2022

**VIA EMAIL**

Ms. Tonia King
MMAC/ESC/AMK326
Commodity Futures Trading Commission
6500 S. MacArthur Blvd.
HQ Room 266
Oklahoma City, OK 73169
9-amc-ar-cftc@faa.gov

Re: *CFTC v. HDR Global Trading Limited, et al.*, Case No. 1:20-cv-08132-LTS-JLC

Dear Ms. King:

We represent Mr. Samuel Reed in the above-referenced matter and write pursuant to paragraph 38 of the Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Defendant Samuel Reed (the "Consent Order"), ECF No. 91.  This letter accompanies the electronic funds transfer of $10,000,000 that was sent today on behalf of Mr. Reed to the account for the Commodity Futures Trading Commission with the U.S. Treasury at the Federal Reserve Bank in New York.  The electronic funds transfer was made in satisfaction of the CMP Obligation set forth in the Consent Order.  A copy of the confirmation of the electronic funds transfer is enclosed with this letter.

Very truly yours,

/s/ *Douglas K. Yatter*

Douglas K. Yatter
Latham & Watkins LLP

Enclosure

cc:    Chief Financial Officer (via FedEx)
        Commodity Futures Trading Commission
        Three Lafayette Centre
        1155 21st Street, NW
        Washington, D.C. 20581
        Elizabeth Pendleton, Commodity Futures Trading Commission (by e-mail)
        Jody Platt, Commodity Futures Trading Commission (by e-mail)
        Carlin Metzger, Commodity Futures Trading Commission (by e-mail)

| | |
|---|---|
| **From:** | fta@signatureny.com |
| **To:** | Patrick Smith |
| **Subject:** | [EXTERNAL EMAIL] [Customer Outgoing Wire Advice - eMail] Message ID:220511134507H200 Advice Code:OTCSADEM |
| **Date:** | Wednesday, May 11, 2022 1:45:34 PM |

ATTENTION: If you are not the intended recipient of this message, please notify FTA@signatureNY.com to remove your email address from the distribution list.

===============================================================================

From: SIGNATURE BK NY Wire Transfer Dept.

In accordance with your instructions, we have DEBITED your account: **********7290 for $10,000,000.00.  If you have any questions, please contact your local branch.

Fed Reference #: 20220511B6B7261F004213

Sender Bank Information:
    ABA #:    026013576
    Bank Name: SIGNATURE BK NY

Receiving Bank Information:
    ABA #:    021030004
    Bank Name: TREAS NYC/FUNDS TR

            * * *

Originator Information:
    Name: SMITH VILLAZOR LLP

Beneficiary Information:
    Name:   TREAS NYC
    Acct #:  **********0001

            * * *

Beneficiary Bank: TREAS NYC/FUNDS TRANSFER DIVIS

Originator to Beneficiary Info: Payment made on behalf of Sam Reed Case 1:20-cv-08132

Bank to Bank information:

# EXHIBIT C

# Beverly M. Rose

April 27, 2022

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street]
New York, New York 10007

**Re: United States v. Hayes, et al.**
    **20 Cr. 500 (JGK)**

Dear Judge Koeltl:

I am writing in connection with the sentencing of Samuel Reed, in the above captioned case. Sam is my grandson and indeed, I have a subjective interest in this matter. However, I may be able to add a view of my grandson others may not have. We are a large and very close family. Although we do not live close together, we visit each other 4-5 times a year, speak on the phone multiple times weekly and participate on a weekly family zoom since the pandemic. Sam's parents are divorced, and his mother was the parent who mostly raised him, but he and his brothers were and are close to their father, as am I. Sam was born with many exceptional gifts into a fairly ordinary family. He is the youngest of three boys; but the most accomplished. Sam always followed the rules. In high school, he never drank or got involved with drugs. He pursued musicals and dramas, instead. He went to Turkey and Vienna with the choir. It was typical for Sam to do more, because he realized he got more. Before graduation, he was named a member of the National Honor Society. He learned early in high school to program computers. He learned at university how to build a drone. While his brothers went to the Wisconsin state universities for their college educations, he sought and gained a scholarship at Washington and Lee University which garnered him many opportunities a state university diploma did not. He established relationships which would advance his post graduate career. He learned to make use of every opportunity afforded him. After building a programming consulting business in Washington, D.C., he went to Hong Kong to do consulting work for a W & L alumni's father, and before he was 30, had assisted in developing an international trading platform to broker a new form of currency, and how to secure the safety of its performance. His extra-ordinary curiosity and intelligence gave him the ability to make things work correctly. He was keen to always work within the norm, within the law.

Sam's intellectual ability is equaled by his social skills. He has a keen sense of humor. He is known for his compassion, generosity and caring for his family and friends, who are many and

diverse. Sam is known as someone to be trusted, as someone who is honest. He and his wife traveled the world to attend each of his friends' weddings; every niece and nephew has had a fund established in their name to take care of their higher educations; and he has established a scholarship at Roncalli High School in Manitowoc, Wisconsin, his high school. Sam takes an active interest in politics and his community, sharing his and others' views regularly via the internet. He is truly an unusual individual.

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

     It is my hope and prayer that you will weigh Sam's past accomplishments, given his young age; his strong moral characteristics, the lack of any prior criminal history, and especially the importance of Sam's role as a father, to render a judgment without including a prison sentence.

Respectfully,

Beverly M. Rose

2

# EXHIBIT D

LAUREN ROSE (REED) HOFLAND



May 9, 2022

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York  10007

Re:    **United States v. Hayes, et al.,**
       **20 Cr. 500 (JGK)**

Dear Judge Koeltl:

I write in connection with the sentencing of Samuel Tracy Reed, my son.  This is the kind of
letter I never thought I would be writing, but I am grateful for the opportunity to share some
insights beyond the charges for which he accepted responsibility.

Sam has always been self-reliant and a problem-solver.  As a single mother of three sons, I was
not able to buy my children some of the expensive toys their friends had.  When he was in
middle school, I got a new job, and he thought my salary should have been enough to purchase a
video game system.  I sat him down and reviewed the budget with him: how much went to the
mortgage, insurance, food, clothes, school, utilities, etc.  He later told me he appreciated that
explanation.  At age 13, he started fixing computers and setting up networks for individuals and
businesses. At 15, he went to Birmingham, England, to set up a computer network for
Manitowoc-based Baileigh Industrial.  A few years later, he bought his own car.  Because it was
a "fixer upper," he learned how to rebuild the car, and he recently expressed his gratitude that I
did not buy him a car as his friends' parents had.  In college, he earned extra money for books,
school trips, and recreation by refurbishing LCD televisions. ████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Sam has always been trustworthy, and he trusts others.  He was always a child and a man of his
word.  He followed the rules, and he never got into trouble.  I understand that this letter is not
about Sam's innocence or guilt: he has taken responsibility for the charge.  But as his mother,
please accept a comment from the person who knows him best.  I truly believe that, as the one
without any experience in the financial world, Sam trusted his partners implicitly with that
critical piece of the business.



Sam has always had a lot of support from friends and family. I was proud of the friends he chose growing up, and he remains close to those friends today. He also is fortunate to have a huge circle of supportive family members.

Respectfully submitted,

Lauren Rose (Reed) Hofland

# EXHIBIT E

5/26/2022

Dear Judge Koeltl,

As a teacher at Sam Reed's high school, I had a chance to get to know him and accompany him through the sometimes challenging years of adolescence. When I think of Sam, I always smile. Sam was a delightful student who always completed assignments above expectation, and engaged in class discussions thoughtfully, meaningfully and respectfully.

I also organized ski trips for the students, and to this day when I'm skiing I think of Sam. He joined us on at least one ski trip during which he seemed to be thoroughly enjoying the experience. In a day when people regularly are shocked that I would choose to spend my time with teens, I found Sam Reed to be kind, respectful, caring, joyful, compassionate, and loving.

Sam was always someone who took school more seriously and was driven to excel academically and otherwise. I remember him playing the character Javert in Les Miserables - he was really great!

After Sam graduated, I would occasionally run into him at a local restaurant or the home of mutual friends. This was always a fun moment for me to get caught up on what Sam was up to.

I know Sam to be a kind, loving, compassionate person, and I have tremendous memories of him. Sam, in my experience, was a student that I will always remember very fondly. I enjoyed him as a student and as a human being. I hope that someday our paths will cross again.

Sincerely,
Mary Ann Teshima

# EXHIBIT F

April 22, 2022

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York  10007


Re: United States v. Hayes, et al.,
20 Cr. 500 (JGK)


Dear Judge Koeltl,

I write in connection with the sentencing of Samuel Reed. I have known Sam for over 10 years.
He has been an amazing friend, colleague, and father during this time.

I am a ███████ veteran who served in Iraq and Afghanistan. I now run a small software
development company with a focus on social impact. We help organizations like: The World
Bank, The Bill & Melinda Gates Foundation, and the Urban Institute with technology to reach
millions of people. I have dedicated my life and my company to helping others. This would have
been much harder if I hadn't met Sam early in my career.

Sam and I met in a co-working space in DC where he was already a member with a tech
company that helped senior citizens in retirement homes with recreation and we became fast
friends. He regularly devoted time to help new and old members with their technology problems.
Half the software and hardware at the coworking space only worked because he took the time
to figure it out. His helpful manner and love of technology made us instant friends.

Sam is one of the major reasons my company has been successful in helping so many people.
He selflessly devoted many hours of his time to help me learn some of the harder aspects of
software development. He has sat down with me countless times to discuss business and how
to be a better tech leader. Without someone like Sam to lean on, I could not have built a
successful company.

Even as his company has grown larger and harder to manage, ███████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████████

I am asking the court to show Sam as much leniency as you can justify when passing his
sentence. He has been a good friend, colleague, and ███████████████████████
████████████████

Respectfully submitted,

Sean Perkins

# EXHIBIT G

June 25, 2022


The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York  10007

> **Re:**    **United States v. Hayes, et al.,**
> **20 Cr. 500 (JGK)**

Dear Judge Koeltl:

     My name is Agata Reed ████████ and I am writing to you in connection with the sentencing of my husband, Samuel Reed. ███████████████████████████████████
████████████████████████████████████████████████████

     At W&L, we connected immediately - we came from similar backgrounds, had similar work ethic, and quickly discovered we both shared a passion for travel. We gravitated towards the same group of friends - an international group I was "adopted into" as a recent immigrant from Poland with a fairly broken English. Like the rest of us, Sam didn't quite fit the standard profile of a W&L student - didn't come from money or the South, and didn't look or dress like the rest of the student body. I still remember my very first impression of him walking down the hallway of his dorm in an oversized dark blue (very wrinkled) button-down and flip-flops two sizes too big, and I admired him for his confidence and not giving in to the pressure of the preppy dress code everyone else seemed to be in on. Several dates later I learned that Sam simply had a terrible sense of fashion that had nothing to do with his self-confidence. His dry wit, sense of humor and endless optimism more than made up for it.

     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████ and Sam began work at a government contractor office, SAIC. Sam always impressed me with his work ethic and fearless approach to chasing his work passion. He pushed me to better advocate for myself at work and not be afraid to take on new challenges. Sam wasn't afraid of taking on new opportunities. He worked for several start-up companies before BitMEX, two of which were based out of DC. The first, Linked Senior, was a software company that delivered entertainment software to senior living facilities. The second, Tixelated, was a business that created a mobile app for event fundraising. Sam's can-do attitude inspired him to launch himself into yet another start-up opportunity a few years later. He was offered a position of a CTO for a software company that would require him to move to Hong Kong. As we always dreamed of traveling, we didn't hesitate to accept and moved to Hong Kong together in early 2013. It was there that Sam met Arthur and Ben, and the idea for BitMEX was born.

After we got married in 2014, we decided to take some time to travel. Sam was just about to launch BitMEX and I was working on getting my credentials as an actuary so it was a perfect time for a few months of nomadic life. After half a year in Europe and Asia, we decided to come back to the US and settled down near Sam's family in Wisconsin. I went back to work as an actuary, and Sam continued his work at BitMEX.

As I reflect on our lives together so far, I am reminded how much I've grown with Sam over the last 15 years. He has been my partner and my best friend. Just as he has been my rock when my work was challenging and overwhelming, he has been supportive and encouraging when I decided to take a break from my career, and become a stay-at-home mom to our son. Our financial circumstances have changed dramatically since we first met, but I don't believe that has changed Sam a bit. He continues to be modest, humble and private. Although our charitable giving goals have not yet been fully established, the donations Sam has made so far have been frequently anonymous to maintain our privacy.

Sam has never been interested in a lavish lifestyle, but instead has focused on using his success to find ways to help friends and family.

Those are just three examples of how Sam's positive influence extends way beyond financial support.



 The almost two years since Sam was arrested have not been easy for him and our family. The memory of that early October morning when the FBI knocked on our door is still terrifying. In the weeks and months following, I've watched Sam struggle mentally and emotionally. I've watched him eventually come to terms with the impact of the mistakes made, and the price he, his co-founders, and BitMEX had to pay as a result. Sam has never been one to cut any corners or take any unnecessary risks, and as a perfectionist in nature, it has been difficult for him to realize how imperfect some of the compliance aspects of BitMEX were. I know Sam has learned many difficult lessons over the last few years. He is one of the brightest people I know, and I have full confidence that he will carry those lessons with him for the rest of his life.

 Thank you for taking the time to read this letter.


Respectfully submitted,

Agata Reed

# EXHIBIT H

May 10, 2022

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

       Re:    **United States v. Hayes, et al.,**
            **20 Cr. 500 (JGK)**

Dear Judge Koeltl:

I am writing regarding the sentencing of Samuel Reed. My name is Lin Qiu, I work as an Engineering Manager for a health insurance platform. Sam and I met in 2012 when we both worked in the first coworking space in DC. The Sam I know is empathetic, intelligent and compassionate.

Sam is first and foremost a software engineer. We got to know each other through our mutual appreciation for code. Sam worked at Linked Senior, a company creating edutainment software for seniors in assisted living facilities. Our first conversation happened in the kitchen of the coworking office over the particulars of a programming language. I remember being struck by his effervescent intensity for software. His passion translated into a commitment for the open source community. One does not contribute freely to open source projects without compassion and dedication. His contributions continue to this day for free software that is available for anyone.

Sam is a good friend. My first marriage resulted in a divorce. During my separation, I traveled to Thailand and met with Sam and his wife Aggie. Just by offering his ear, Sam helped me through a tumultuous time. Sam and Aggie also took time out of their busy schedules to travel to my second wedding. Not only did they show up, but they stayed a day after to visit with us. I have fond memories with them of spending the afternoon after my wedding playing board games and eating leftovers. His down-to-earth and unpretentious nature left a great impression on my in-laws.

Sam is a great father. ███████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

███████████████████████████████████

███████████

I am not a mind reader but in the 10 years that I have known Sam he has consistently shown his true character. He has proven himself to be reliable and trustworthy. There are not many people who deserve a true second chance, but Sam is one of them. He is a patron for open source software. He is a friend I can count on. He is a great husband and father.

Thank you for the opportunity to share my thoughts.

Respectfully Submitted,

Lin Qiu

# EXHIBIT I

RICK METZGER | ████████████████████████████

May 31, 2022

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York  10007

   **Re:**  **United States v. Hayes, et al.,**
     **20 Cr. 500 (JGK)**

Dear Judge Koeltl:

   I write in connection with the sentencing of Samuel Reed. I first met Sam over a decade ago in DC, where we were both underpaid web developers working for now defunct start-up businesses. He was always very easy to talk to, his presence even then was calming. Among our shared circle of friends at the time, I understood Sam to be a person you could trust to do the right thing.

   Thru our shared circle we vacationed together around the world. When in other countries Sam was always cordial and respectful to our hosts and service staff (waiters, custodians, etc). When travel delays and canceled flights happened, I never knew Sam to put that frustration on anyone else; he'd remain cool and collected.

   I've had the pleasure of meeting his immediate family and his extended family several times; it's easy to see where Sam gets his demeanor from – his family is also a very kind and thoughtful group of people to be around. I've seen Sam and his wife, Aggie, ████████████████ ████████████████████████████

   I'm very proud to call Sam a friend.

         Respectfully submitted,

         *Rick Metzger*

         Rick Metzger

# EXHIBIT J

Brian McDaniel

May 22nd, 2022

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    **Re:** **United States v. Hayes, et al.,**
      **20 Cr. 500 (JGK)**

Dear Judge Koeltl:

   I write in connection with the sentencing of my friend, Samuel Reed. My name is Brian McDaniel, and I've known Sam for over 4 years. Sam and I are part of a close group of friends, all of us connected by a love of technology and computer programming. Even though we're geographically distributed, we keep in touch both online and through weekend get-togethers.

   Within our friend group, Sam is known as being smart, generous with his time, and always willing to help. One example of Sam's impact on my life is when I was evaluating a particularly difficult career decision. I had been working as a freelancer for over 6 years, and I was considering accepting a full time job at a startup company - a big life change. At that time, I actually didn't know Sam very well, but a mutual friend suggested that I reach out to Sam to get his advice, so I did.

   Even though he was extremely busy, Sam spent several hours with me over multiple phone calls to help me work through this tough decision. Ultimately, I took the leap of faith and accepted the job, which ended up being a great decision. I don't think I would have had the confidence to make this decision without Sam's encouragement and advice, and I know he's helped other people in our friend group similarly.

   In all of my interactions with Sam, I've always known him to be a great person and a great friend. Thank you for allowing me the opportunity to share my feelings about Sam.

          Respectfully submitted,

          *Brian N McDaniel*

          Brian McDaniel

# EXHIBIT K

May 11, 2022

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York  10007

      **Re:**    **United States v. Hayes, et al.,**
               **20 Cr. 500 (JGK)**

Dear Judge Koeltl:

I write in connection with the sentencing of Samuel Reed.

Sam is one of my oldest and closest friends. Our friendship began twenty-three years ago in the sixth grade, and it has flourished ever since. We have evolved into persons very different from the children that met decades ago, and yet our friendship thrives, rooted in an affection and understanding that transcends income, education, location, and all those other factors that play into so many of our adult relationships.

Having been asked to write this letter, I have spent some time reflecting on my relationship with Sam. What is it about Sam that makes our friendship so strong? After much consideration, I think the answer to that is trust.  Sam is the kind of person people want to be around because he is a person you can trust. You can trust him to be kind, you can trust him to be honest, and you can trust him to be there when he is needed most.

██████████████████████████████████████████████████████████ and so Sam made it a priority to fly in and spend a weekend with me. Not only did Sam show up when I needed him most, he showed up exactly as I needed him – wearing an old t-shirt from high school and willing to help me however he could. That weekend, I asked Sam to clean the dust bunnies from under my bed; a chore that I was unable to do myself but was too embarrassed to ask of anyone else. I could ask Sam. That is who Sam is – a man who is genuine, and a man who cares; who shuns pretentiousness and remains the solid friend you've always relied on. His financial success has not changed him; Sam is and has always been a good man and a great friend.

Recently, my partner and I went to visit Sam and his wife Agatha. ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

I submit my attestation to the great strength of Sam's character.

Thank you for your time and consideration.

                         Respectfully submitted,

                         Stephanie Lambert, MPH
                         Manitowoc County Health Officer

# EXHIBIT L

Júlio Santos



May 4, 2022

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York  10007

       Re:    **<u>United States v. Hayes, et al.,</u>**
                **20 Cr. 500 (JGK)**

Dear Judge Koeltl,

My name is Júlio Santos and I am writing in regard to the character of my friend, Samuel Reed.

I met him in 2015, through a mutual friend vacationing in Thailand who invited a number of folks to come visit. Samuel was not the first American I'd met, but was certainly the one that fit my stereotype the best: bold, gregarious, joyful, larger than life. I remember jokingly remarking to my wife, with whom I'd recently watched The West Wing, how I finally understood what they meant with the word "presidential".

I was a programmer at the time, so he and I talked shop a few times. I was more than a little envious of his skills, and surprised at how generous and patient he was with someone less capable such as myself. I'm grateful for his input on my work, which he doled out with no transactional expectations. He was legitimately happy to help — programming is hard, he knows he's good, and I believe his reward is simply knowing he can help others get better. I remember hoping to work with him someday.

We met and vacationed together a few times since then, and as we grew closer I had the opportunity to observe additional facets of his nature. Samuel embodies the Silicon Valley archetype of unbridled optimism while somehow sidestepping the usually concomitant arrogance and entitlement. He believes people are naturally good, that evil is an emergent epiphenomenon of a broken system, and that the duty of those with his wit and good fortune is to help mend it. It's inspiring and endearing, presumptuous as it may be.

I am relieved this ordeal hasn't yet broken his disposition, and pleased to see him reflect on his actions. I am confident he will remain a steadfast husband, loving father, generous citizen and supportive friend. I pray that my words can carry what's in my heart, and appreciate you having taken the time to read them.

                                   Respectfully submitted,

                                   Júlio Santos

# EXHIBIT M

# EXHIBIT N

# SMITH | VILLAZOR

Smith Villazor LLP
250 West 55th Street, 30th Floor
New York, NY 10019
www.smithvillazor.com

**PATRICK J. SMITH**
**T**  212 582 4400
patrick.smith@smithvillazor.com

February 11, 2022

**VIA E-MAIL**

Jessica Greenwood
Samuel Raymond
Nathan Rehn
Assistant United States Attorneys
United States Attorney's Office
1 St. Andrew's Plaza
New York, New York 10007

Re:    *United States v. Hayes, et al.*, No. 20 Cr. 500 (JGK)

Dear Ms. Greenwood, Mr. Raymond, and Mr. Rehn:

Pursuant to our mutual agreement to provide additional disclosure on this date of potential expert witness testimony under Fed. R. Crim. P. 16(a)(1)(G) and 16(b)(1)(C), Defendants Arthur Hayes, Benjamin Delo, and Samuel Reed (together "Defendants") hereby supplement their prior disclosures dated November 8, 2021 and November 19, 2021 concerning the expert analysis by AquaQ Analytics ("AquaQ") on the database that HDR Global Trading Limited ("HDR") made available to both the government and the defense via secure laptops.

Defendants reserve the right to amend or supplement these disclosures prior to or during trial, and Defendants may determine to introduce testimony on additional topics by AquaQ or to introduce testimony of other experts in response to the government's disclosures, ongoing discovery, or trial evidence.

Defendants further reserve the right to challenge or move to exclude any or all expert testimony that the government discloses before trial or seeks to offer during trial. Nothing in this letter should be construed as a representation or concession that any evidence, opinion, or information is, or is not, relevant or admissible at trial. Defendants reserve the right to move *in limine* or otherwise to exclude evidence, opinion, or argument on any topic and to seek other relief as may be appropriate in the case.

Based upon AquaQ's ongoing review and analysis of the data, which remains preliminary and subject to revision, we presently anticipate that Jonny Press (or a back-up AquaQ witness) will testify as to the following analysis and opinions concerning the data made available to both the government and the defense on the secure laptops provided by HDR:

February 11, 2022
Page Two

1.  The data contained in the spreadsheet marked as AquaQ-1 (volume.csv) was extracted from the historical trading engine data.  AquaQ-1 shows, for the period from inception through September 30, 2020:

    a.  Fees by month

    b.  Contracts traded by month

    c.  Volume in BTC by month

    d.  Volume in USD by month

    e.  Number of accounts trading by month

    f.  Number of deposits by month

    g.  Percentage change in volume in USD from preceding month

    h.  Gross change in volume in USD from preceding month

2.  The spreadsheet marked as AquaQ-2 (draft.csv) includes certain data extracted from the historical trading data alongside data relating to user information from the Postgres/SQL data, and reflects analysis of that data.  The data and analysis in the spreadsheet is part of the basis for the preliminary observations and opinions in paragraphs 3-8, below.

3.  Average revenue per user ("ARPU") is a breakdown of the average fees earned per user per month.  It is a simple sum of the fees earned in a month, taking into account the daily BTC/USD exchange rate reflected in the trading engine data, and divided by the number of users actively trading in that month.

4.  Lifetime average revenue per user is a simple average taking all of the revenue earned, taking into account the daily BTC/USD exchange rate reflected in the trading engine data, and dividing it by the number of users that ever deposited and traded at least once, each of which is a "Trading User."  Lifetime average revenue per Trading User is approximately $2,533.

5.  Length of Trading User Engagement ("LTUE") is a metric that considers the length of time a Trading User stays active on the system, as measured by the difference between the first and last time a trade is executed by that Trading User. Using the average from all Trading User trading activity, the data indicates that the length of Trading User engagement is approximately 10 months.  Using a median value of all Trading User trading activity, the length of Trading User engagement is approximately 3 months.

6.  The data indicates that between the start of trading on BitMEX and September 30, 2020, a total of 1,597,988 users registered with BitMEX.   582,313 of those users

February 11, 2022
Page Three

were Trading Users.  The overall percentage of users who convert to Trading Users is therefore approximately 36% of registered users.

7.  The data indicates that 58,278 users registered on BitMEX with a country setting of "US."  None of these user accounts deposited and none traded, i.e., none became Trading Users.  A reasonable estimate of the number of these registered users who would have traded but for a restriction is 36% of 58,278, or 20,980, which reflects the rate at which registered users convert to Trading Users.  With an average lifetime revenue per Trading User of approximately $2,533, a reasonable estimate of the revenue not earned from users who registered with a country setting of "US" is $53,142,340 (20,980*$2,533).

8.  The data indicates that approximately 36,000 Trading Users had their risk limit set to zero (risklimit=0 in the margin table).  Each of these Trading Users had either an entry in the user table indicating that the country field had been changed to "US," or had its geoipcountry field set to "US" following a login from a US-based IP address.  For approximately 32,000 of these Trading Users (the "Banned Users"), the risk limit in the margin table was never increased above zero after the date on which the user account was restricted and no new positions were permitted.  Revenue not earned from these 32,000 Banned Users may be estimated by considering ARPU in the month the trading restriction was imposed and considering the number of additional months of revenue that user account would have generated based upon the LTUE metric, as well as by considering the overall lifetime average revenue per user metric:

   a.  Using the average LTUE of 10 months and applying the simple assumption that each account was at the midpoint of the 10-month period, estimated revenue not earned from Banned Users is approximately $56,700,000.

   b.  Using the median LTUE of 3 months and applying the simple assumption that each account was at the midpoint of the 3-month period, revenue not earned from Banned Users is approximately $26,400,000.

   c.  Using the simple lifetime average revenue per user of $2,533 and applying the simple assumption that half of the lifetime revenue was yet to be earned from each Banned User, the revenue not earned from Banned Users is approximately $41,600,000.

9.  The data indicates that approximately 4,000 Trading Users, after having been restricted due to an apparent US nexus, later successfully went through a know-your-customer process that resulted in a change of that user's country to a non-US jurisdiction and had trading enabled.  These 4,000 user accounts have been excluded from the population of Banned Users used to estimate revenue not earned by BitMEX in paragraphs 8(a)-8(c).

February 11, 2022
Page Four

10. Approximately 5,650 of the population of 36,000 Trading Users referenced in paragraph 8 originally restricted due to a potential US connection had language set to Chinese.

11. AquaQ-3 (risklimit.csv), is a spreadsheet that shows (a) the overall number of accounts for which risk limit was set to zero by month and (b) the number of accounts for which risk limit was set to zero due to a US nexus.

12. The data indicates that 178 user accounts that registered with a non-US country did not deposit and trade, were later restricted as a result of an IP address check upon login that showed a US IP address, and thereafter never deposited and traded.

*       *       *

In addition to the opinions set forth above, AquaQ is conducting additional analysis of the data relevant to purported US users reflected in, among other things, country revenue reports, analytics reports, and options value reports disclosed by the government.

Very truly yours,

 */s/ Patrick J. Smith*
Patrick J. Smith
of SMITH VILLAZOR LLP

Harlan A. Levy
of FOLEY HOAG LLP

*Counsel for Benjamin Delo*

Douglas K. Yatter
Benjamin Naftalis
of LATHAM & WATKINS LLP

*Counsel for Samuel Reed*

James J. Benjamin, Jr.
Katherine R. Goldstein
Peter I. Altman
of AKIN GUMP STRAUSS HAUER & FELD LLP

*Counsel for Arthur Hayes*

# EXHIBIT O



# EXHIBIT P

# EXHIBIT Q

US_00173668
BMX-PROD-00002583



CONFIDENTIAL

# EXHIBIT R



BMX-SDNY3-00090720
US_00932019

# EXHIBIT S

Attorney's Eyes Only

3547-4.001

Attorney's Eyes Only

3547-4.008

# EXHIBIT T



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 14, 2022

**BY EMAIL**

Patrick Smith
Andrew Rodgers
SMITH VILLAZOR LLP
250 West 55th Street
30th Floor
New York, NY 10019
212-582-4400 / 212-377-0854
patrick.smith@smithvillazor.com
andrew.rodgers@smithvillazor.com
Counsel for Ben Delo

Harlan Levy
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY US 10019
646-927-5554
hlevy@foleyhoag.com
Counsel for Ben Delo

Douglas Yatter, Esq.
Benjamin Naftalis, Esq.
Jack McNeily, Esq.
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Douglas.Yatter@lw.com
Benjamin.Naftalis@lw.com
Jack.McNeily@lw.com
Counsel for Samuel Reed

Re:    *United States v. Benjamin Delo & Samuel Reed*, 20 Cr. 500 (JGK)

Dear Counsel:



Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By: _____

Samuel Raymond
Jessica Greenwood
Nathan Rehn
Assistant United States Attorneys
(212) 637-6519/1090/2354